**TRIXLER BROKERAGE COMPANY, a California corporation, Appellant,**

v.

**RALSTON PURINA COMPANY, a corporation, Appellee.**

No. 73-1197.

United States Court of Appeals, Ninth Circuit.

Nov. 5, 1974.

Stuart R. Pollak (argued), Howard, Prim, Rice, Nemerovski, Canady & Pollak, San Francisco, Cal., for appellant.

Noble K. Gregory (argued), Pillsbury, Madison & Sutro, San Francisco, Cal., for appellee.

Before MERRILL and KILKENNY, Circuit Judges, and CRARY,* District Judge.

## OPINION

KILKENNY, Circuit Judge:

Appellant appeals from an adverse judgment in a non-jury trial, in an action against appellee for alleged violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), bad faith, breach of contract and misrepresentation. Appellant is a corporation engaged in the food brokerage business, acting as an independent sales agent in northern California for various food processors and manufacturers. Appellee, among other things, is a corporation engaged in processing and manufacturing food.

## FACTUAL BACKGROUND

A summary of the facts, stated favorably for appellee, is as follows: In 1952 when Van Camp Sea Food Company, a predecessor of appellant, decided to change its marketing scheme from direct sales to brokerage, J. Thomas Trixler, president of appellant, resigned as an employee of Van Camp and became its broker and a broker for other food processors. Trixler then incorporated his business, and his company was orally appointed by Van Camp as broker for northern California. Later, the appellant company was formed and took over the California operations of its predecessor. Since that time it has been managed by Trixler, its president and principal shareholder.

In 1963, appellee acquired Van Camp, the latter continuing as an administrative division of the former. Trixler continued as broker for the Van Camp tuna products under an arrangement which was not formally expressed, either orally or in writing. From 1953, appellee, in accordance with accepted business practice, conducted regular studies to determine the relative economics of marketing its products through brokers as opposed to direct sales. In the early fifties, it marketed all of its consumer products through a direct sales force. Later, in the mid-fifties, it changed courses and by 1960 all of its consumer products were marketed by brokers. By the use of brokers, appellee was unable to give its junior management personnel sufficient sales experience to enable them effectively to supervise and work with food brokers. Consequently, in 1965, appellee established a direct sales force in St. Louis to provide a training ground for sales management personnel. This force failed to provide a sufficient number of trained personnel, and in 1966 another force for training purposes was established in Los Angeles.

* The Honorable E. Avery Crary, United States District Judge for the Central District of California, sitting by designation.

In 1965, and subsequently, appellant inquired from time to time as to appellee's overall policy concerning brokers and was told that appellee was "broker minded" or "broker oriented" and that there were no plans to terminate appellant. To this date, no national sales force has been established by appellee, none is planned, and most of its tuna products are still marketed through brokers. Even after the establishment of the direct sales force in Los Angeles in 1966, there was no decision or plan to extend the direct sales training force until February, 1968. In the so-called "Operation February" report, San Francisco, Philadelphia and Baltimore-Washington were selected as feasible markets for the institution of a direct sales training area. The recommendation that San Francisco be selected was dated April 23, 1968, and approval for it was given on April 24th. Appellant was notified on May 6, 1968, of its termination as broker for Chicken of the Sea tuna, but was asked to continue as broker through July 31, 1968.

From at least 1968 until the time appellant ceased representing appellee, appellant was aware of the fact that appellee might consider returning to direct sales in northern California. When the termination decision was made, appellant was offered two months equivalent brokerage.[1] The offer of equivalent brokerage was extended to retain the good will of appellant during the change-over period and to provide payment to appellant during the transition. On May 28, 1968, appellant notified appellee that it was ceasing to represent appellee as of June 30, 1968. On July 1, 1968, appellant began representing Carnation, a competitive brand of tuna. Appellant received brokerage through June 30th.

---

1. Equivalent brokerage is the sum computed by applying the broker's commission to sales actually made in the period for which brokerage is being paid, even though the sales are made by another broker or a direct sales force.

## PLEADINGS

On December 24, 1968, appellant filed a complaint charging breach of contract, bad faith and violations of the antitrust laws previously noted. Ralston answered and counter-claimed for brokerage paid by mistake. No jury was requested by either party. On September 8, 1969, appellant moved for a jury trial. The motion was denied as untimely. Then appellant filed a motion for leave to amend the complaint, stating two additional causes of action. The amended complaint was filed, and appellant then filed a demand for a jury trial on its two additional causes. A motion to strike the jury demand was granted. Subsequently, the court denied appellant's motion to reconsider the demand for a jury trial, and the case proceeded to trial before the court. After trial, the court rendered its memorandum of decision against appellant and in favor of appellee. The court later signed and filed detailed findings of fact and conclusions of law on which judgment was entered against appellant on its claims and in favor of appellee on its counter-claim for $1,558.78.

## CONTENTIONS

Briefly stated, appellant's contentions are:

(I) that it was entitled to a jury trial on its sixth and seventh claims;[2]

(II) that appellee's conduct constituted an unreasonable restraint of trade which proximately caused damage to appellant in violation of Section 1 of the Sherman Act;

(III) that the trial court applied an erroneous rule of law in requiring direct evidence of intent to monopolize on a claim of attempted monopoly under Section 2 of the Sherman Act.

---

2. Counsel for the parties erroneously referred to the claims as "causes of action." See Rule 8(a), (e) (2), F.R.Civ.P.

## JURY REQUEST

Appellant concedes that it failed to file a timely motion for a jury trial on its first five claims. It asserts, however, that a timely demand was made for a jury trial on the issues created by the sixth and seventh claims set forth in the amended complaint. The answer lies in whether the sixth and seventh claims created new *issues* within the meaning of Rule 38(b), F.R.Civ.P.[3] [Emphasis supplied.]

In addition to incorporating by reference all of the allegations in the previous four claims charging Sherman Act violations, the fifth claim of appellant's original complaint—on which appellant failed to ask for a jury trial—alleged that in May, 1968, the appellee and another surreptitiously attempted to induce salesmen and other employees of appellant to breach and terminate their employment contracts with appellant and to accept employment with appellee. The claim then went on to charge that this conduct and " . . . *the termination of Trixler's brokerage agreements, . . . were performed [by appellee] in bad faith and in violation of* [appellee's] *obligation to act in good faith and to deal fairly with . . .* " appellant. [Emphasis supplied.]

The appellee, not surprisingly, sought additional information with reference to the charges of bad faith and unfair dealings set forth in the fifth claim. On discovery, in answer to an interrogatory as to the facts on which it based its bad faith charges in that claim, the appellant's response was vague and indefinite. Being dissatisfied with this response, appellee sought additional details on the nature of the bad faith charges. In answer to this request for clarification, the appellant expanded on its previous statement of the bad faith charges in the fifth claim and stated:

"Over a period of several years, commencing in or about 1965 and continuing through April 1968, Ralston Purina represented to Trixler that there was no possibility in the foreseeable future of Ralston Purina substituting a direct sales force for brokers in Northern California, or in any area other than in St. Louis (in April 1965) and in Los Angeles (in August 1966), and that such a substitution was not the subject of consideration or study by Ralston Purina. Said representations were made by Ralston Purina to Trixler on at least the following occasions, by and to the following named individuals:

(a) In or about August 1965, R. H. Dean so represented to J. Thomas Trixler;

(b) In or about January 1966, R. H. Dean so represented to J. Thomas Trixler;

(c) In or about May 1966, Glenn Copeland so represented to J. Thomas Trixler;

(d) In or about November 1967, R. L. Siler, Guy Dougherty and Bob McMath so represented to J. Thomas Trixler and John T. O'Leary."

It will be observed that each allegation in the supplemental response amounts to a charge of bad faith and a violation of "appellee's obligation to act in good faith and to deal fairly with" the appellant, as alleged in the fifth claim.

Particularly significant is the fact that appellant's alleged sixth and seventh claims use substantially the same language employed by appellant in its supplemental response to appellee's inquiry into the basis of the bad faith charges in the fifth claim. Clearly, the allegations of bad faith in the fifth claim are sufficiently broad to permit evidence

---

3. "(b) *Demand.* Any party may demand a trial by jury of any issue triable of right by a jury by serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue. Such demand may be indorsed upon a pleading of the party."

of the acts charged in the sixth and seventh [4] claims.

Although designated as the sixth and seventh causes of action, they are in fact neither causes of action nor claims. At most, they clarify the charges already made in the fifth claim. The sixth and seventh claims, by elaborating on the charges of bad faith in the fifth claim, did not create new *issues*. By any reasonable analysis, the identical issue of bad faith is charged in each one of the claims. We need not further clutter the legal publications by citing authority to support the statement that pleadings under F.R.Civ.P. are to be liberally construed. In these circumstances, having waived its right to a jury trial on its fifth claim, the appellant is not entitled to a jury trial on a more detailed statement of the same charge in the sixth and seventh claims.

Cataldo v. E. I. DuPont De Nemours & Co., 253 F.Supp. 235 (S.D.N.Y.1966), upon which appellant relies, would be a fragile foundation on which to rest our decision. First of all, the case is not binding on us. Next, we question if in the circumstances of this case appellant's sixth and seventh claims introduced new *theories* of recovery. Bad faith is the underlying theory of all. Finally, we hold that the presentation of a new *theory* does not constitute the presentation of a new *issue* on which a jury trial should be granted under F.R.Civ.P., Rule 38(b).

Manifestly, the *issue* contemplated by the Rule is one of fact. When read in context, the word *issue* must have been intended by the Supreme Court to mean nothing other than an issue of fact. Obviously, appellant would not be demanding a jury trial on an issue of law. A *theory* of recovery, as distinguished from an issue of fact, in normal parlance presents a question of law. Even a casual reading of the applicable subdivision of the Rule makes it clear that the *issue* on which demand may be made for a jury trial is not created until service of the "last pleading directed to such *issue*." The *theory* of a case relates to the ultimate basis of liability, rather than to an *issue* created by the pleadings. An *issue* of fact does not exist unless there is an allegation and a responsive denial. A *theory* of recovery exists from the outset, irrespective of a responsive pleading. A word, such as *issue*, with a fixed legal meaning is presumed to have been used in that sense. Bradley v. United States, 410 U.S. 605, 609, 93 S.Ct. 1151, 35 L.Ed.2d 528 (1973); Barber v. Gonzales, 347 U.S. 637, 74 S.Ct. 822, 98 L.Ed. 1009 (1954). Moreover, the use of the word *issue*, in these circumstances, would imply the exclusion of the word *theory*. Matheson v. Armbrust, 365 U.S. 870, 81 S.Ct. 904, 5 L.Ed.2d 860 (1961); Arley v. United Pacific Ins. Co., 379 F.2d 183 (CA9 1967), cert. denied, 390 U.S. 950, 88 S.Ct. 1039, 19 L.Ed.2d 1140 (1968). We decline to follow *Cataldo*.

Much more in point, although factually distinguishable, are Alcoa S. S. Co. v. Ryan, 211 F.2d 576 (CA2 1954); Railex Corp. v. Joseph Guss & Sons, Inc., 40 F.R.D. 119 (D.D.C.1966), aff'd, 127 U.S. App.D.C. 230, 382 F.2d 179 (1967), and Reeves v. Pennsylvania R. Co., 9 F.R.D. 487 (D.Del.1949). All of the evidence which might be introduced under the specific allegations set forth in claims six and seven was, in fact, received by the trial court under the allegations of the fifth claim. Specific findings against appellant were made on all of these charges. In finding against appellant on its allegations in the fifth claim, the lower court necessarily disposed of appellant's contentions as set forth in its alleged sixth and seventh claims.

## RESTRAINT OF TRADE

Despite appellant's forceful arguments to the contrary, we agree with the district court's findings that appellee did not violate Section 1 of the Sherman Act, 15 U.S.C. § 1, and thus hold that they are not clearly erroneous.

Under the doctrine stated in Bushie v. Stenocord Corp., 460 F.2d 116

---

4. Which is, in substance, a duplication of the allegations in the sixth.

(CA9 1972), appellee was entitled to terminate appellant's brokerage services provided that valid business reasons underscored the termination and that there was no parallel arrangement for restraining trade. Appellant concedes that a manufacturer may normally control the distribution of its own products, choose its customers as it sees fit, and cease doing business with a particular distributor at any time. United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), and Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (CA9 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970), rehearing denied, 397 U.S. 1003, 90 S.Ct. 1113, 25 L.Ed.2d 415. Appellant also concedes that the district court properly held that the standard for determining whether an arrangement violates Section 1 of the Sherman Act is whether it is so inherently anti-competitive in purpose or effect, or both, as to constitute an unreasonable restraint of trade. At this point, however, the appellant parts company with the lower court and argues that it committed reversible error by holding that the "non-compete" provision was reasonable in scope and duration and served a legitimate business purpose not in restraint of trade. Our examination of the record convinces us that the trial court did not erroneously apply the standards mentioned in Alpha Distributing Co. of Cal., Inc. v. Jack Daniel Distillery, 454 F.2d 442, 452 (CA9 1972), and that there is ample evidence in support of its finding that the "non-compete" provision was reasonable in scope and duration and served a legitimate business purpose not in restraint of trade.

Appellant's contention that there was an oral brokerage contract between appellant and appellee to last as long as appellant ably performed its responsibility, and that appellee breached that contract, presents a question of fact. Appellant is here faced with the adverse finding of the trial court that no such oral contract existed and that there was no fixed term of duration, either explicit or implicit, or that appellant would continue to have appellee's account as long as appellant "continue to do a good job." These findings are not clearly erroneous.

Nor do we find substance in appellant's claim that appellee's qualified offer of 60 days' "equivalent" brokerage constituted an unreasonable restraint of trade. Again, on this issue, the lower court made specific findings against the appellant and, additionally found that appellant was not "otherwise entitled" to equivalent brokerage. These findings are supported by the record and are controlling on the issue.

## ATTEMPTED MONOPOLIZATION

Finally, appellant urges that the trial court applied an erroneous rule of law in requiring direct evidence of intent to monopolize on a claim of attempted monopolization under Section 2 of the Sherman Act.

At the outset, we must recognize that a manufacturer, such as appellee, has a natural monopoly over its own products, especially when the products are sold under trademark. Industrial Bldg. Materials, Inc. v. Interchemical Corp., 437 F.2d 1336, 1344 (CA9 1970). Under such circumstances, there is no violation of the antitrust laws unless the manufacturer uses his natural monopoly to gain control of the relevant market in which his products compete.

Appellant's argument that the establishment of his claim in restraint of trade under Section 1, creates a *prima facie* case of attempting to monopolize under Section 2, falls of its own weight. Since we have already held against appellant on its Section 1 claim, that claim cannot be used to create a *prima facie* case for a Section 2 claim of attempting to monopolize.

Utilizing language in Lessig v. Tidewater Oil Co., 327 F.2d 459, 474 (CA9 1964), cert. denied, 377 U.S. 993, 84 S. Ct. 1920, 12 L.Ed.2d 1046, and Industrial Bldg. Materials, Inc. v. Interchemical

Corp., *supra*, appellant argues that the lower court was in error when it held that appellee had no intent to monopolize the tuna business and did not attempt to monopolize it. In each of those cases, the attempt to monopolize claim was founded upon a substantial claim of restraint of trade, and in those circumstances we held that the specific intent required for a claim of attempting to monopolize could be inferred. Since appellant failed on its restraint of trade claim, no basis for the inference ever existed.

■■■■■ Appellant challenges the lower court's conclusion that: "To prove a violation of section 2 of the Sherman Act, the plaintiff must show a specific intent to monopolize *and sufficient market power to establish a 'dangerous probability' of success.*" [Emphasis Supplied.] Even conceding that the relevant market is not in issue where the charge is attempt to monopolize, rather than monopolization, *Industrial Bldg. Materials, Inc., supra,* 437 F.2d at 1344, nonetheless, the district court's finding that appellee had no intent to monopolize the tuna business and did not make such an attempt, is controlling. The conclusion of the court on appellant's burden with reference to the relevant market is surplusage and in no way prejudiced the appellant. The court's finding of a lack of intent [5] is sufficient, in itself, to destroy appellant's attempted monopolization claim.

## CONCLUSION

Without going into further detail, we hold the there is ample evidence to support the findings of fact of the lower court, that the court correctly applied the law to the facts before it, and that none of its findings is clearly erroneous.

We have not discussed in detail each of appellant's contentions. However, we have considered them and feel that a more detailed discussion would unduly lengthen this opinion, without enlightenment to the bench or bar, and without change in the ultimate result.

Affirmed.

MERRILL, Circuit Judge (concurring):

I concur in Judge Kilkenny's opinion.

In addition to the facts recited by him I would note that the offer of equivalent brokerage was conditioned upon appellant not representing products which appellee considered "competitive" with its tuna products; that the offer further provided that appellant would be free to begin representing competitive brands at any time and would nevertheless be entitled to receive equivalent brokerage for such time during the two-month period as it did not represent competitive brands.

I understand Judge Kilkenny to hold that the basic issue here presented under § 1 of the Sherman Act is whether, in light of the course of dealing between the parties, this offer of equivalent brokerage conditioned on this covenant not to compete was, as matter of law, reasonable or unreasonable. On this I agree with Judge Kilkenny that as matter of law it was reasonable.

---

5. "29. Ralston Purina had no intent to monopolize the tuna business here involved and did not attempt to monopolize that business. The limitation in its offer was reasonable in time and scope. Its purpose was not furtherance of any attempt to monopolize, nor was it aimed at securing the power to control prices or eliminate competitors. There was no shortage of brokers to handle the products of Ralston Purina's competitors" (R.Vol. 6, 1390).