**FOUNT–WIP, INC., a California Corporation, and National Fount-Wip Vegetable Products, Inc., an Illinois Corporation, Plaintiffs-Appellants,**

v.

**REDDI–WIP, INC., a corporation, Hunt-Wesson Foods, Inc., a corporation, Marcus Lipsky, an Individual, Brookhill Farms, Inc., a corporation, Farm Fresh Sales, Inc., a corporation, and Chicago Fount-Wip Distributing Company, Inc., a corporation, Defendants-Respondents.**

No. 74–1818.

United States Court of Appeals, Ninth Circuit.

Feb. 6, 1978.

Gary B. Lovell, Newport Beach, Cal. (argued), of Baltaxe & Klein, Beverly Hills, Cal., for appellant.

Maxwell M. Blecher (argued), of Blecher, Collins & Hoecker, Los Angeles, Cal., for appellee.

Before CHAMBERS and HUFSTEDLER, Circuit Judges, and WONG,* District Judge.

HUFSTEDLER, Circuit Judge:

The plaintiffs won this antitrust case before a jury, but promptly lost their victory when the district court granted defendants' motion for judgment notwithstanding the verdict and, in the alternative, their motion for a new trial. We affirm judgment for the defendants on the Sherman Act, Section 2 and Clayton Act, Section 7 claims, but we remand plaintiffs' Sherman Act, Section 1 claim for a new trial because the district court could not properly take away from the jury that portion of the case.

This whipped cream battle is an outgrowth of a bitter family feud. Plaintiff corporations are owned by Lapin, the brother-in-law and former business partner of Lipsky. From 1951 to 1959, Lapin and Lipsky jointly owned and operated Reddi-Wip, which licensed the production and distribution of aerosol whipped cream topping. Irreconcilable differences arose in the family in 1959, and Lapin and Lipsky parted. Lipsky retain control of Reddi-Wip; Lapin acquired control of Reddi-Wip's former subsidiaries, Fount-Wip and National Fount-Wip Vegetable Products. Fount-Wip produces aerosol whipped cream topping from a dairy base. National Fount-Wip Vegetable Products produces whipped cream from a vegetable base.

As part of the dissolution agreement, Lapin and Lipsky entered into a covenant of non-competition covering the seven-year period from 1959 to 1966. Lipsky agreed to confine Reddi-Wip's licensees to the production and distribution of aerosol whipped cream for sale to the retail trade, primarily supermarkets, and Lapin agreed to confine the Fount-Wip companies to the institutional trade, such as restaurants, hotels, and quick-service food chains.

In Chicago, the center of the activities involved, the two principal independent whipped cream producing dairies were Brookhill Farms and Super Whip Sales. Super Whip sold primarily to the retail market. Brookhill sold both to the retail and to the institutional trades. The other important whipped cream production facility in Chicago was the Instant-Whip plant; Instant-Whip is not a party to this litigation. Unlike Brookhill and Super Whip, Instant-Whip was not a licensee of a whipped cream formula franchisor; its facilities were used only by its parent, the Instant-Whip company.

Lipsky offered to purchase Lapin's interest in Fount-Wip in 1964. According to Lapin, the offer was made at a private meeting attended only by Lapin and Lipsky. Lapin testified that when he rejected the offer, Lipsky threatened to drive him out of business.

Reddi-Wip acquired Super Whip in 1964. The following year, Reddi-Wip, acting through Super Whip, acquired Brookhill and two-thirds of the stock of Super Whip Valve Company, which was engaged in the production of aerosol valves for sale to manufacturers of aerosol whipped toppings. Lipsky thereafter took no action to termi-

---

* Honorable Dick Yin Wong, United States District Judge for the District of Hawaii, sitting by designation.

nate Brookhill's contract with Fount-Wip. Rather, Fount-Wip's contract was extended two years to the end of 1967 on the same terms that previously existed. Six months before the expiration of that contract, the parties began negotiating for a new agreement. The negotiations were characterized by hard bargaining on both sides, but the parties were soon deadlocked about the size of the royalty that Brookhill would pay Fount-Wip and about the duration of the new contract.

In November, 1967, the defendants offered to continue the royalty terms of the old contract for a period of one year, with a potential renewal for a second year. Lapin held out for a three-year agreement. Lapin claimed that in December, he decided to accept the Brookhill offer. However, the parties were unable to get together until February, 1968, at which time the Brookhill offer was withdrawn. By April, the negotiations had collapsed, and Lapin lost Brookhill as a franchisee.

The parties' explanations for failing to reach agreement are sharply conflicting. According to Lipsky, Fount-Wip was the victim of technological progress in the aerosol whipped cream industry. Until 1965, Fount-Wip's position in the production of aerosol whipped cream was secure because Lapin owned the patent rights of the so-called Neilsen gun, a large reusable aerosol container which held more fill and was more suitable to institutional use than the seven-ounce disposable cans used for the production of whipped cream for retail sales. Lipsky claimed that the Neilsen gun had many disadvantages; it was more expensive and less sanitary than disposable cans, and it required substantial labor costs to make it reusable.

In 1965, the American Can Company developed a large disposable can which eliminated the disadvantages of the Neilsen gun

while preserving its advantages. Brookhill began ordering disposable cans from Fount-Wip, and, by the end of 1967, almost all of Brookhill's sales of Fount-Wip's product were in disposable cans. Nevertheless, Brookhill performed its contractual obligations by continuing to pay Fount-Wip a three and one-half cents per can royalty on the disposable cans which, unlike the Neilsen gun, could be purchased directly by Brookhill without paying royalties. During the lengthy negotiations Brookhill pressed for a reduction in the royalty to one and one-half cents per can. Lapin refused, but offered to continue the old royalty for a shorter time. By February, 1968, when no agreement was reached, defendants asserted that their offer had been rejected.

Lapin argued that the collapse of negotiations and the termination of Brookhill's dealings with Fount-Wip were a part of Lipsky's plan to drive him out of business. He insisted that the collapse of negotiations was caused by Lipsky and that Lipsky knew that Lapin was prepared to accept Lipsky's offer during December and January. Lapin charges that Lipsky was negotiating in bad faith, evidenced by a number of incidents that he described as malicious during the 1967–68 period.

During the fall of 1967, Brookhill began ordering disposable cans directly from American Can Company, and it also prepared the art work for the new Brookhill label which was to replace the Fount-Wip labels. Brookhill changed the mix of disposable and returnable cans to facilitate replacement of Fount-Wip's labels with Brookhill's. During the same period, a similar dispute erupted in the New York distribution area, where a Reddi-Wip franchise production facility stopped making Fount-Wip products, and, at the conclusion of the contractual period, Brookhill failed to return returnable cans to the appellants.[1]

---

1. As a result of Brookhill's failure to return the returnable cans Lapin sued Brookhill in federal district court in Chicago for breach of contract. At that time Lapin alleged that the failure to return the cans precluded Fount-Wip from securing a new licensee in Chicago and thus brought about its exclusion from the Chicago market. That action was settled, and Lapin received a payment from defendants. Defendants now argue that since the injury claimed in both the contract and antitrust actions (exclusion from the Chicago whipped topping market) is the same, and since, as a part of the settlement of the former action, Lapin relieved

Plaintiffs claim that the breakdown of the Brookhill-Fount-Wip talks, together with the termination of their contractual relationship, constituted an unlawful refusal to deal in violation of the Sherman Act. The theory is that Lipsky, through the companies that he controlled, undertook a series of acquisitions and bad faith commercial activities in a successful effort to drive the plaintiffs out of business in the Chicago area. In support of this theory, plaintiffs point out that the only aerosol whipped cream production facilities in Chicago were those of Brookhill, Super Whip, and Instant-Whip. When the contract negotiations collapsed, the Brookhill plant was no longer available to Fount-Wip, and Instant-Whip produced only Instant-Whip whipped cream. Lapin claimed that opening new production facilities in the Chicago market was not economically feasible by reason of the size of defendants' operations. Thus, plaintiffs argue, the effect of Reddi-Wip's acquisitions of Brookhill and Super Whip, together with the termination of the Brookhill-Fount-Wip contract, was the exclusion of the Fount-Wip companies from the Chicago market. Plaintiffs also contend that defendants' control over the aerosol whipped topping production plants in the Chicago area constituted monopolization in violation of Section 2 of the Sherman Act (15 U.S.C. § 2) and that the effects of Reddi-Wip's acquisitions of Brookhill, Super Whip, and Super Whip Valve "may be to lessen competition, or to tend to create a monopoly" in violation of Section 7 of the Clayton Act (15 U.S.C. § 18).

■ Although a company may ordinarily deal or refuse to deal with whomever it pleases without fear of violating the antitrust laws (*e. g., United States v. Colgate & Co.* (1919) 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992), refusal to deal which is anticompetitive in purpose or effect, or both, constitutes an unreasonable restraint of trade in violation of the Sherman Act. (*See, e. g., Mutual Fund Investors, Inc. v. Putnam*

*Management Co.* (9th Cir. 1977) 553 F.2d 620, 626; *Westinghouse Electric Corp. v. CX Processing Laboratories, Inc.* (9th Cir. 1975) 523 F.2d 668, 673; *Trixler Brokerage Co. v. Ralston Purina Co.* (9th Cir. 1974) 505 F.2d 1045, 1051; *Bushie v. Stenocord Corp.* (9th Cir. 1972) 460 F.2d 116, 119; *Alpha Distributing Co. of California v. Jack Daniel Distillery* (9th Cir. 1972) 454 F.2d 442, 452; *cf. Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors Ltd.* (9th Cir. 1969) 416 F.2d 71, 77–78.)

■ Two contested factual issues were presented: (1) Did defendants refuse to deal, and (2) if so, was the refusal a product of anticompetitive motive? These factual issues could not be taken from the jury "unless 'the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict . . .'" (*Cockrum v. Whitney* (9th Cir. 1973) 479 F.2d 84, 85, quoting *Brady v. Southern Ry.* (1943) 320 U.S. 476, 479, 64 S.Ct. 232, 88 L.Ed. 239.) In making that determination, we are bound to view the evidence in the light most favorable to the party in whose favor the jury verdict was rendered and to give that party the benefit of all inferences that might fairly have been drawn by the jury. (*Continental Ore Co. v. Union Carbide & Carbon Corp.* (1962) 370 U.S. 690, 696, 82 S.Ct. 1404, 8 L.Ed.2d 777.) We must also be mindful of the Supreme Court's admonition that summary procedures which take a case away from the jury "should be used sparingly in complex antitrust litigation where motive and intent play leading roles." (*Poller v. Columbia Broadcasting System, Inc.* (1962) 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458.)

■■ Although substantial evidence was in the record from which the jury could have found that Lapin, rather than Lipsky, was responsible for the collapse of the negotiations or that the termination was based

defendants from the claims asserted in the contract case, plaintiffs' antitrust action is barred by res judicata. However, the parties expressly reserved any antitrust claims from the settle-

ment, and, in any event, the release and res judicata defenses were not preserved because they were not raised in the pleadings or the pretrial statement.

upon legitimate business purposes, the record also contains sufficient evidence, apparently credited by the jury, that the opposite was true. There was testimony that Lipsky had threatened to wipe out Lapin and that Lipsky had also taken steps to drive Lapin out of the New York market area. Moreover, evidence was abundant that personal enmity between the two men was long standing. To be sure, Lipsky's anticompetitive purpose was primarily founded in personal animosity. Fount-Wip and Reddi-Wip apparently did not view each other as competitors, and only after Reddi-Wip had acquired Brookhill did they become, even indirectly, trading partners. Nevertheless, Lapin and Lipsky, warring through their separate corporations, chose to fight out their personal conflict on an economic battlefield. If defendants did conspire to drive Lapin out of business, then a combination in restraint of trade existed which fits within the plain words of the statute. The pernicious consequences to competition of the claimed combination are not lessened because the motivation underlying intentionally anticompetitive conduct is personal malice rather than economic self-interest.[2]

The weight of the evidence may well have supported the district court's conclusion that the termination of Fount-Wip's contract and the collapse of negotiations were the result of Lapin's obduracy and of technological progress. But, "[i]t is the jury, not the judge, which 'weighs the contradictory evidence and inferences, judges the credibility of witnesses, . . . and draws the ultimate conclusion as to the facts . . . . Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.'" (*Cockrum v. Whitney, supra*, 479 F.2d at 86, *quoting Tennant v.*

*Peoria & P. U. Ry.* (1944) 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520.)

Applying these well-settled principles to the record, we cannot sustain the district court's grant of judgment notwithstanding the verdict in favor of defendants on the refusal to deal claim.

■ The gist of plaintiffs' two monopolization claims is that Lipsky's acquisitions "tend to create a monopoly" in violation of Section 7 of the Clayton Act, and have in fact created such a monopoly, in violation of Section 2 of the Sherman Act. Plaintiffs' contentions must fail because of their failure adequately to define and to prove the relevant market, which is "a necessary predicate" for evaluating claims under these provisions of the antitrust laws. (*United States v. Marine Bancorporation, Inc.* (1974) 418 U.S. 602, 618, 94 S.Ct. 2856, 41 L.Ed.2d 978 (Clayton Act); *accord United States v. E. I. duPont de Nemours & Co.* (1956) 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (Sherman Act, Section 2).)

■ In defining the relevant market, the court must look beyond the particular commodity produced by an alleged monopolist because the relevant product market for determining monopoly power, or the threat of monopoly control, depends upon the availability of alternative commodities for buyers. Illegal monopoly does not exist merely because the production of a particular product is "monopolized." "What is called for is an appraisal of the 'cross-elasticity' of demand in the trade." (*duPont, supra*, 351 U.S. at 394, 76 S.Ct. at 1007; *accord Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.* (9th Cir. 1975) 512 F.2d 1264, 1271.) "In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that com-

---

**2.** Rejecting plaintiffs' claim on the ground that defendants' anticompetitive conduct was based on personal rather than economic considerations would, in effect, be an application in the antitrust context of a distinction between motivation and intent which has been rejected as unworkable in constitutional adjudication. *See, e. g.,* Note, *Legislative Purpose and Feder-*

*al Constitutional Adjudication*, 83 Harv.L.Rev. 1887, 1887–88 n. 1 (1970) ("It is probably fruitless to attempt a principled articulation of the distinction between motive and purpose."); *accord*, Ely, *Legislative and Administrative Motivation in Constitutional Law*, 79 Yale L.J. 1205, 1217–21 (1970).

modities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce' monopolization of which may be illegal." (*duPont, supra,* 351 U.S. at 395, 76 S.Ct. at 1007.)

 Plaintiffs have proposed a very narrow definition of the relevant market: the facilities available in the Chicago area for the production and sale of aerosol whipped topping to the institutional trade. This market definition is premised on the unsupported assumptions that the institutional and retail trades constitute separate markets and that the production facilities outside Chicago have no impact on the Chicago market area. Nothing in the record supports plaintiffs' narrow definition. They adduced no evidence that their market concept reflects the economic realities of the whipped topping industry. Moreover, defendants introduced evidence that (1) a variety of commodities functionally interchangeable with aerosol whipped cream were available in Chicago, and (2) these alternative toppings—such as whipped topping in plastic tubes, and dry powder to which milk is added—were responsive to changes in the aerosol price structure. Plaintiffs did not rebut defendants' substantial evidence that these other forms of whipped topping are "significant substitut[es] in fact" for aerosols for relevant market purposes. (*Greyhound Computer Corp. v. International Business Machines Corp.* (9th Cir. 1977) 559 F.2d 488, 493.) Plaintiffs were unsuccessful in shrinking the relevant market to the dimension of their product. (*duPont, supra.*) They failed to bear their burden of proof in establishing the relevant market, and the district court correctly rendered judgment notwithstanding the verdict on this phase of the case.[3]

 The district court did not abuse its discretion in granting a new trial on the

Section 1 Sherman Act claim. On a motion for a new trial, the district court may properly consider the credibility of witnesses and the weight of the evidence. (9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2531, at 575 (1971).) Although the district court could not take the case away from the jury by granting a motion for summary judgment, it acted well within its discretion in granting defendants' motion for a new trial.

We vacate the judgment in favor of defendants on plaintiffs' Sherman Act, Section 1 claim; in all other respects, we affirm the district court, and we remand the case for a new trial on the Section 1 claim. The parties shall each bear their own costs on appeal.

---

**3.** Because there was a complete failure of proof on the relevant market issue, we need not examine the adequacy of plaintiffs' efforts on the monopolization count in computing market shares. Nor need we consider whether the Chicago institutional aerosol whipped topping market may be a "well-defined submarket"

which the Supreme Court has recognized may constitute a product market under the Clayton Act (*Brown Shoe Co. v. United States* (1962) 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510). The plaintiffs failed to introduce adequate evidence supporting such a possibility.