**William F. TRIMBLE,
Plaintiff/Appellee,**

v.

**SONITROL OF MEMPHIS, INC., Sonitrol-Cook, Inc., and Mid-South
Sonitrol, Inc., Defendants/Appellants.**

Court of Appeals of Tennessee,
Western Section,
at Jackson.

Aug. 18, 1986.

Rehearing Denied Sept. 29, 1986.

Permission to Appeal Denied by
Supreme Court Jan. 5, 1987.

Eugene J. Phelan and Saul Kay, Memphis, for defendants/appellants.

J. Alan Hanover and James R. Newsom III, Hanover, Walsh, Jalenak & Blair, Memphis, for plaintiff/appellee.

HIGHERS, Judge.

This case involves a secured transaction in connection with the sale of two corporations. The first corporation was sold for $100 via an asset purchase agreement, and the second corporation was sold for over a million dollars for which promissory notes were executed by the second corporation. These notes were secured by a security interest in the assets of both corporations. As additional security for the notes, the stock of the second corporation was to be delivered to an escrow agent. Upon the defendant corporation's failure to make a payment on the notes, the plaintiff repossessed the collateral, sold the collateral of one corporation and sought approval for sale of the collateral of the second. After a protracted series of pleadings, countercomplaints, motions, and hearings, in which the claims of other secured creditors of the defendant corporations were bifurcated for another trial, the court found that the plaintiff had sold one corporation in a commercially reasonable manner and approved the sale of the second.

The defendant assigns as error the following issues: (1) Whether the Chancellor erred in dismissing the defendant's counterclaim for lack of standing; (2) whether the Chancellor erred in finding that the defendants had waived their right to a jury trial; (3) whether the Chancellor erred in finding that the plaintiff disposed of the collateral in a commercially reasonable manner. The chronological sequence of events is as follows.

Sonitrol Corporation, Limited in Orlando, Florida is the parent company of the two defendant businesses involved in this litigation. Sonitrol Corporation is involved in providing security services and systems to businesses and homes throughout the United States. Sonitrol Corporation has eight distributorships in the United States who work on a franchise basis. Defendant Mid-South Sonitrol, Inc. owns one of these eight distributorships. This franchise is Mid-South's main collateral. Mid-South buys inventory from Sonitrol Corporation and sells this inventory and provides services for these products to various dealers throughout Tennessee. The dealers then sell to the general public. Defendant Sonitrol of Memphis is one of these dealers serviced by Mid-South.

For ten years, plaintiff Trimble was the sole owner of the distributorship (at that time called Sonitrol of Tennessee) and of the dealership, Sonitrol of Memphis, Inc. Both of these businesses had and still have their principal place of business at the same location in Memphis. On May 26, 1982, Trimble contracted with Ted Cook and Associates to sell both the distributorship and the dealership. Trimble sold the stock of Sonitrol of Memphis, Inc. (the dealership) to Sonitrol-Cook, Inc. which thereafter effected a merger with Sonitrol of Memphis, Inc. and changed its name to Sonitrol of Memphis, Inc. Trimble sold the assets of Sonitrol of Tennessee (the distributorship) to Mid-South Sonitrol, Inc. under an asset purchase agreement for $100.

In connection with the purchase of the shares of stock of the dealership, Sonitrol-Cook, Inc. executed promissory notes in the face amounts of $70,000 and $1,370,000 payable to Trimble. The dealership also agreed to assume liability for a computer which was under a security agreement with United American Bank and had a balance of $160,000. The total value paid for the stock, including this assumption, the promissory notes, and cash paid, was approximately 2 million. Payment of the promissory notes was secured by a continuing security interest in certain assets of both the dealership and the distributorship. These security interests were formalized in

two Security Agreements, both dated June 30, 1982, one of which was between Trimble and Sonitrol of Memphis, Inc. Sonitrol of Memphis admits that it is in default on a $17,500 installment due on the $70,000 promissory note. Mid-South originally admitted it was in default on the notes, but then denied this default later.

As additional security for the notes, Sonitrol-Cook, Inc. executed a Stock Pledge and Escrow Agreement wherein the dealership agreed to endorse and deliver certain certificates of common stock of Sonitrol of Memphis, Inc. into an escrow account. The default provision in that agreement stated:

> Upon the occurrence of any default under any of the Notes or the Stock Purchase Agreement, all rights of Buyer to exercise voting and other shareholder rights and to receive dividends shall cease immediately, and all such rights shall become vested in Seller, who shall have the sole and exclusive authority to exercise such voting and other shareholder rights and to receive such dividends; provided, however, that the amount of the outstanding obligation of Buyer to Seller shall be reduced by the amount of any dividend which is declared prior to default, paid in cash and received by Escrow Agent.

This stock was never delivered.

On June 30, 1982, Mid-South entered into a management contract with Sonitrol of Memphis wherein Mid-South was to manage Sonitrol of Memphis and was to be paid 10% of the net operating income.

On June 20, 1983, based on the failure to pay the $17,500 installment due on the $70,000 promissory note, plaintiff Trimble filed a complaint against Sonitrol of Memphis, Sonitrol-Cook, Inc., and Mid-South Sonitrol for Writ of Possession and for Recovery of Personal Property and Money Damages. On June 28, 1983, the defendants, Sonitrol of Memphis, Inc., Sonitrol-Cook, Inc., and Mid-South Sonitrol, Inc., answered, admitting default but denying that this default accelerated the entire debt. The defendants averred that they were prepared to pay the balance due on the $70,000 note

($35,000) and that it would be inequitable to require a forfeiture. On June 29, 1983, the court entered an order finding that the defendants had defaulted on the payment of the notes and that unless the defendants made certain payments, the plaintiff was entitled to immediate possession. These payments were not made. The plaintiff did not cause the Writ of Possession to be executed but, instead, took control of the collateral on July 1, 1983, by virtue of the "self-help" provision of the Uniform Commercial Code. The plaintiff changed the locks on the doors to the place of business for the distributorship and the dealership.

On July 12, 1983, plaintiff Trimble sent notice to all secured creditors, shareholders and defendants that the distributorship and dealership assets would be sold at the private sale.

On August 31, 1983, Mid-South filed a petition to compel plaintiff to post bond and file inventory and to enjoin plaintiff from operating the business and from selling the property. Mid-South's claim was that it was not a signatory to any of the promissory notes in question and that, therefore, Trimble had arbitrarily and wrongfully taken possession of Mid-South's property including inventories, writings, files, invoices, checkbooks, and monies.

On September 9, 1983, Mid-South answered Trimble's complaint for writ of possession and also counterclaimed. In this answer, Mid-South denied that it was in default, denied that it executed any promissory notes to Trimble, and denied that Trimble was entitled to a writ of possession. In the counterclaim, Mid-South alleged that Trimble breached the Asset Purchase Agreement by barring Mid-South from operating and collecting money and fees from the Mid-South business and by misrepresentations in the agreement. Mid-South claimed also that Trimble was tortiously interfering with Mid-South's management contract rights with Sonitrol of Memphis and that Trimble wrongfully seized Mid-South's property. Mid-South prayed for $500,000 in actual damages and

$1,000,000 in punitive damages and attorney fees.

Also, on September 9, 1983, plaintiff Trimble filed a response to Mid-South's petition of August 31, 1983 requesting that plaintiff post bond, file inventory and be enjoined. In his response, plaintiff alleged that because of the Security Agreement between Mid-South and plaintiff, plaintiff had a first security interest in Mid-South's franchise and distributorship rights. Plaintiff alleged that he was operating the collateral to preserve its value and had given notice of a private sale pursuant to his rights as secured creditor under the court's order of June 29, 1983, and pursuant to his rights under the Tennessee Uniform Commercial Code. Plaintiff also alleged that he had taken inventory and was willing to turn over those assets not encumbered by plaintiff's security interest.

On September 10, 1983, the court held a hearing on the Mid-South petition. In an order dated October 5, 1983, the court held that Trimble was a secured creditor of Mid-South and the other defendants and that Trimble had rightfully taken possession of the collateral pursuant to the June 29th order and pursuant to his rights under the U.C.C. The court held, also, that Trimble was authorized by T.C.A. § 47–9–207(4) to operate the collateral to preserve its value pending a private or public sale. The court, accordingly, denied the injunction but required that the plaintiff either turn over Mid-South property not subject to the security interest or in the alternative post a $20,000 bond. This order was later modified to the extent that no affirmative finding was made that Trimble had the right to dispose of his collateral in Sonitrol of Memphis, Sonitrol-Cook, Inc., or Mid-South Sonitrol. This modification was not retroactive so as to affect the plaintiff's sale of his collateral in Sonitrol of Memphis. Trimble had sold the collateral of Sonitrol of Memphis to A.S. Hart and Ronald K. Moore at a private sale on September 23, 1983, for the sum of $1,150,000 plus the assumption by the parties of the balance due on the computer of approximately $150,000. (The circumstances of this sale will be discussed later.) Plaintiff claimed that this left an amount owing of $255,000 plus interest and fees. Plaintiff, therefore, gave notice to the parties and other secured creditors of a public sale of the franchise and distributorship rights of Mid-South. Cook filed a bankruptcy petition on September 26, 1983, and began Chapter 11 proceedings. This sale, therefore, was automatically stayed. The bankruptcy court lifted the automatic stay on December 29, 1983, to allow these proceedings in Chancery Court to continue.

On December 27, 1983, the defendants filed an application for injunction asking the court to enjoin the plaintiff from disposing of the collateral of Mid-South, to require an accounting on a monthly basis, and to require a bond to be posted.

A hearing was held on January 9, 1984, in which the court granted the injunction provided that the defendant/counterplaintiff Mid-South posted $250,000 security within five days. The court ordered that in case the bond was not posted that any sale of the collateral must be approved by the court. The court also required the plaintiff to post $50,000 to secure Mid-South's counterclaim for damages as against plaintiff and required the plaintiff to provide an accounting of all collections or proceeds plaintiff had received while he was operating the distributorship and dealership. The $250,000 bond was never posted by the defendant Mid-South. The plaintiff was allowed to post a bond secured by real estate with an equity of $150,000 in lieu of the $50,000. Therefore, on February 9, 1984, plaintiff asked the court to approve the sale of the assets of Mid-South for $250,-000.

On June 15, 1984, plaintiff filed a motion to determine secured status of defendants' debt to plaintiff and for clarification regarding order of reference. The defendants answered denying that plaintiff was a secured creditor and that any clarification concerning the order for accounting was not necessary as the order was self-explanatory and the plaintiff had willfully disregarded it.

An order was issued setting the case for trial and allowing the defendants to file an amended answer and counterclaim. The defendant, Sonitrol of Memphis, Inc., did file an amended answer and counter-complaint. This answer requested, for the first time, a jury trial. The counter-complaint alleged that because the plaintiff wrongfully took possession of defendant's property, defendant had a claim for conversion, invasion of privacy, deprivation of constitutional rights, abuse of legal process, and loss of profits. Defendant also alleged that the notice of the sale of Sonitrol of Memphis was defective. The plaintiff answered the counter-complaint and also filed a motion to strike the jury demand. This order was granted.

The case was heard on October 3 and 4. The court held (1) the counter-defendants were without standing to prosecute their counter-complaints, and therefore, the counter-complaints should be dismissed with prejudice; (2) the sale of the assets of Sonitrol of Memphis, Inc. in a private sale on September 23, 1983, was commercially reasonable in all respects; (3) the proposed sale of the franchise assets of Mid-South Sonitrol for $250,000 should be judicially approved; (4) the proceeds of both sales together were insufficient to satisfy the debts to plaintiff, but the plaintiff had disclaimed his entitlement to deficiency judgment against the defendants.

The first issue is: Whether the trial court erred in dismissing the defendants' counterclaim on the basis that they lacked standing to bring such an action.

At the beginning of the October 3, 1984 hearing, plaintiff argued that the Stock Pledge and Escrow Agreement executed by defendant Sonitrol-Cook, Inc., in connection with the sale of Sonitrol of Memphis, required the defendant to deposit the stock of defendant Sonitrol of Memphis, Inc. with an escrow agent named in said agreement. This stock along with the assets of the corporation were to secure the payments of the promissory notes executed by Sonitrol of Memphis and plaintiff in connection with the sale of Sonitrol of Memphis. The defendant Sonitrol-Cook, Inc. failed to deliver this stock of Sonitrol of Memphis into escrow. The Stock Pledge and Escrow Agreement provides:

Upon the occurrence of any default under any of the Notes or the Stock Purchase Agreement, all rights of Buyer to exercise voting and other shareholder rights and to receive dividends shall cease irmediately, and all such rights shall become vested in Seller, who shall have the sole and exclusive authority to exercise such voting and other shareholder rights and to receive such dividends; provided, however, that the amount of the outstanding obligation of Buyer to Seller shall be reduced by the amount of any dividend which is declared prior to default, paid in cash and received Escrow Agent.

The plaintiff argued that when Sonitrol-Cook, Inc. failed to pay the $17,500 installment on the promissory note, not only did the promissory note allow acceleration of the debt due but also the Stock Pledge Agreement allowed the stock and all rights to vest automatically in the plaintiff. Thus, the defendants in this action could not pursue any counterclaim against the plaintiff. The court agreed with plaintiff's argument and stated:

In considering those documents, the Court finds that there are intertwining agreements between the three corporate defendants and the plaintiff such that on the material issue of fact that is not in dispute, which is the April 15, 1983, default on the $17,500 note, that triggers the rights for the plaintiff that fundamentally allow the plaintiff to take over all of the assets of these corporations and to attempt to liquidate them to satisfy the underlying indebtedness, and that that indebtedness, under the terms of these documents, allow for an acceleration of all indebtedness.

And that is what has occurred, and there is no basis, therefore, for this Court to find that, based on the stock pledge agreements, that the defendants

have standing. And, therefore, the Court rules that they do not.

The language of the Stock Pledge Agreement is clear. The parties agreed that upon default the stock would vest in the plaintiff. The defendants argue, however, that this type of agreement is prohibited by law.

■ The general rule is that under a pledge agreement, the pledgee does not acquire title to the property pledged as collateral. *Nashville Trust Co. v. First National Bank*, 123 Tenn. 617, 134 S.W. 311 (1911), *Wilson v. Hayes*, 29 Tenn.App. 49, 193 S.W.2d 107 (1945). The pledgee acquires only a special property in the collateral with the right to sell upon default in the payment of the debt. The absolute title to the collateral is not divested out of the pledgor until foreclosure or a sale upon proper notice to the pledgor. 193 S.W.2d at 109. In the present case, the parties agreed, however, that upon default under any of the promissory notes or Stock Purchase Agreement all "voting and other shareholder rights" were to vest in the pledgee, plaintiff Trimble.

The law applicable to this transaction and determinative of whether this provision in the Stock Pledge Agreement is void is the Uniform Commercial Code. T.C.A. § 47–9–102(1) and (2) states:

Policy and scope of chapter.—(1) except as otherwise provided in § 47–9–103 on multiple state transactions and in § 47–9–104 on excluded transactions, this chapter applies so far as concerns any personal property and fixtures within the jurisdiction of this state:

(a) to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, accounts or contract rights; and

(b) to any sale of accounts, contract rights or chattel paper.

(2) This chapter applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security. This chapter does not apply to statutory liens except as provided in § 47–9–310.

■ The Code, however, is silent as to where title to the collateral lies. The Comments to Official Text following T.C.A. § 47–9–101, although not authority, indicate that the parties are free to contract as they will concerning the location of title. Because the Code is silent as to this point, T.C.A. § 47–1–103 would allow other principles of law and equity to supplement the code provisions.

The defendants cite 18 C.J.S., *Corporations*, § 431, p. 1028 as authority for the proposition that this vesting clause is void:

[A] default in payment only gives the pledgee (the right) to realize it in an appropriate proceeding; it does not give him ownership of the stock nor entitle him to take the stock as his own in satisfaction of the debt, *even though there is a provision in the contract by which the absolute property in the stock is to vest in the pledgee on default of the debtor, such a provision being void.* (emphasis added.)

*Hawley v. Hawley*, 114 F.2d 745, 750–751 (D.C.Cir.1940) states that this is the "universally accepted rule." Under Common Law, the pledgee has rights of ownership in the stock that cannot be contracted away. These rights of ownership include bringing an action for possession or proceeds of the stock, a suit for injunction to restrain the pledgee from selling the stock and an action for damages for any loss sustained by the pledgee due to the unlawful or negligent acts of the pledgor. See, generally C.J.S. *Corporations* § 432 pp. 1036–1038 and cases cited therein. Further, even under the Code, the debtor is prohibited from contracting away certain rights. T.C.A. § 47–9–501(3) states:

(3) To the extent that they give rights to the debtor and impose duties on the secured party, the rules stated in the

subsections referred to below may not be waived or varied except as provided with respect to compulsory disposition of collateral (subsection (1) of § 47-9-505) and with respect to redemption of collateral (§ 47-9-506) but the parties may by agreement determine the standards by which the fulfillment of these rights and duties is to be measured if such standards are not manifestly unreasonable:

    (a) subsection (2) of § 47-9-502 and subsection (2) of § 47-9-504 insofar as they require accounting for surplus proceeds of collateral;

    (b) subsection (3) of § 47-9-504 and subsection (1) of § 47-9-505 which deal with disposition of collateral;

    (c) subsection (2) of § 47-9-505 which deals with acceptance of collateral as discharge of obligation;

    (d) § 47-9-506 which deals with redemption of collateral; and

    (3) subsection (1) of § 47-9-507 which deals with the secured party's liability for failure to comply with this Part.

We, therefore, hold that the Chancellor erred in finding that the defendants in this action lacked standing to bring a counterclaim against the plaintiff. The question that follows is: Is this error harmless?

T.R.C.P. 65.04(7) provides:

    (7) CONSOLIDATION OF HEARING WITH TRIAL ON MERITS. Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application. Even when this consolidation is not ordered, any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial and need not be repeated upon the trial....

The evidence received at the September 10, 1983 hearing on defendant Mid-South's petition for an injunction and incorporateed into the October 5, 1983 order, therefore, did not need to be repeated at trial. It becomes a part of the record.

The court found at that hearing that: (1) Trimble was a secured creditor of Mid-South and the other defendants in this case; (2) in taking possession of the collateral, he was acting within his rights under the U.C.C. and pursuant to court order; and (3) Trimble was rightfully in possession of the collateral and was operating the collateral to preserve its value pending a private or public sale. The defendants' counterclaims for conversion, tortious interference with contract rights and damages all fall after these findings. These claims all rest on the assumption that Trimble was not a secured creditor or that he had taken control of the collateral in an improper manner. Upon a finding that Trimble was a secured creditor, T.C.A. § 47-9-503 gives him the right to take possession of the collateral if it is done without breach of the peace, and the court found that Trimble took over the collateral in a proper manner.

    ■ The record, therefore, shows that the defendants were given a full and fair hearing on the claims raised in their counterclaims as well as on their rights to a commercially reasonable sale (T.C.A. § 47-9-501) which were adjudicated in the final hearing in this case. The Chancellor's finding that the defendants lacked standing was, therefore, harmless error. *See* T.R.A.P. 36(b).

    ■ The second issue raised by the defendants is whether the Chancellor erred in denying the defendants' demand for a jury trial.

T.C.A. § 21-1-103 gives the parties to a suit in Chancery the right to a jury trial. T.R.C.P. 38.02 provides the method for demanding a jury trial:

    Demand.—Any party may demand a trial by jury of any issue triable of right by jury by demanding the same in any pleading specified in Rule 7.01 or by endorsing the demand upon such pleading when it is filed, or by written demand filed with the clerk, with notice to all parties, within fifteen (15) days after the

service of the last pleading raising an issue of fact.

The defendants did not raise the demand for a jury on their original answer of June 28, 1983, nor on Mid-South's answer and counterclaim of September 9, 1983, but did demand a jury trial for the first time on Sonitrol of Memphis' answer and counter-complaint filed July 13, 1984. This last answer and counterclaim was filed after the defendants requested and the court granted leave to file an amended answer on the basis that the original answer was sketchy. The question presented is: Which is the "last pleading raising an issue of fact"?

No Tennessee cases have directly addressed this issue. 5 Moore's Federal Practice, § 38.41, p. 38–366 states: "It is now well settled that where the amendment creates new jury issues, a party upon timely demand therefor is entitled to a jury trial, if the amended pleading sets forth new factual issues and not merely a different legal theory."

In *Trixler Brokerage Co. v. Ralston Purina Co.*, 505 F.2d 1045 (9th Cir.1974), the Court held that a jury demand made on an amended complaint but not on the original complaint was not timely when the amended complaint contained just "a more detailed statement of the same charge" as in the original complaint. 505 F.2d 1050. This was so even though the plaintiff alleged a different legal theory in the amended complaint because the same evidence would be received under either complaint, and according to the court, "the *issue* contemplated by the Rule is one of fact." 505 F.2d at 1050.

The amended answer and counter-complaint in the present case arise from the same transaction, occurrences and events that were subject of the original complaint. The original complaint was the "last pleading raising an issue of fact." The defendants, therefore, failed to properly demand a jury trial, and according to T.R.C.P. 38.05, they have waived this right. The Chancellor is affirmed as to his order denying the request for a jury trial.

The third issue raised by the defendants is whether the Chancellor erred in finding that the plaintiff disposed of the collateral in a commercially reasonable manner.

The circumstances of the sale were as follows. On July 12, 1983, the plaintiff's attorney sent notice of a private sale to be held on or after July 22, 1983, to the defendants, all secured creditors and shareholders by regular and certified mail. The plaintiff testified that due to problems in locating potential purchasers for a private sale (a problem found by the Chancellor to have been caused by Ted Cook contacting potential purchasers and causing concern about possible lawsuits attached to the sales) he decided to give notice of a public sale. A notice of a public sale to be held on September 28, 1983 was sent September 14, 1983. When the plaintiff learned that Cook was going to place the corporate defendants into bankruptcy, the plaintiff re-evaluated the offers under the private sale and sold the dealership, Sonitrol of Memphis, Inc. to Hart and Moore on September 23, 1983 for $1,150,000.

The questions raised by the defendants are: (1) The adequacy of the notice of the time and place of the private sale; (2) whether the sale was in keeping with prevailing trade practices in the industry; and (3) the sufficiency of the resale price of the collateral.

T.C.A. § 47–9–504(3) requires that "reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor ..." The purpose of this notice provision was stated in *International Harvester Credit Corp. v. Ingram*, 619 S.W.2d 134 (Tenn.App.1981):

We think the provision for notice in connection with a sale is intended to afford the debtor a reasonable opportunity (1) to avoid a sale altogether by discharging the debt and redeeming the collateral or (2) in case of sale, to see that the collateral brings a fair price.

619 S.W.2d at 137. A secured creditor has a choice between conducting a private sale or a public sale whichever is the more commercially reasonable. T.C.A. § 47–9–504(3); *C.I.T. Corp. v. Lee Pontiac, Inc.*, 513 F.2d 207 (9th Cir.1975); *Hertz Commercial Leasing Corp. v. Dynatron, Inc.*, 37 Conn.Supp. 7, 427 A.2d 872 (1980); *Old Colony Trust Co. v. Penrose Industries Corp.*, 280 F.Supp. 698 (D.C.Pa), affirmed, 398 F.2d 310 (3rd Cir.1968). "Authority to dispose of collateral at a private sale is calculated to allow a 'higher realization on collateral for the benefit of all parties.'" 619 S.W.2d at 138, quoting Comment 1 to T.C.A. § 47–9–504.

■ The debtor in the present case had proper notice of a private sale. Ted Cook, acting for the defendants, did not offer to redeem the collateral or attempt to assist in obtaining the highest price but, instead, as the Chancellor found, went "around attempting to do everything he could to kill this sale." Testimony was presented that Mr. Cook tried to subvert the upcoming sale by making representations creating difficulty with and hampering Mr. Trimble's efforts to make a private sale. It was because of the difficulty in finding potential purchasers at a private sale, a situation caused by Ted Cook's activities, that the plaintiff gave notice of a public sale to be held on September 26. The plaintiff proceeded with the private sale on September 23 after becoming aware of Ted Cook's plans to place the defendants into bankruptcy, a situation that would have further hampered a favorable sale of the collateral. This is the factual situation that the Chancellor found to be true and that led to his holding that the notice of a private sale was adequate under T.C.A. § 47–9–504(3). Certainly, the purpose of seeing that the collateral brought a fair price, which underlies the notice provisions, was fulfilled, as much as possible given the defendant's behavior. Further, Ted Cook testified that he was not prepared to make a cash offer on this collateral. The defendants, therefore, were not in any position to redeem the collateral. We hold, therefore, that the purposes underlying the notice requirement were adequately served by the notice of a private sale by the plaintiff.

■ The next question is whether the plaintiff's disposition of the collateral was made in keeping with the prevailing trade practices "among reputable and responsible business and commercial enterprises engaged in the same or similar business." *See Mallicoat v. Volunteer Finance & Loan Corp.*, 57 Tenn.App. 106, 415 S.W.2d 347 (1966).

In *In re Four Star Music Co., Inc.*, 2 B.R. 454 (Bankr.M.D.Tenn.1979), the Court dealt with this question as regards unique collateral that was of interest only to a limited number of purchasers. The court stated that "[i]t is obvious that in disposing of unique collateral the secured party must make significant attempts to reach the most logical purchasers." 2 B.R. at 462.

In the present case, plaintiff advised Sonitrol distributors and dealers at the national distributors' meeting that the assets were for sale. Trimble advised all eight of the distributors to tell their dealers of the availability of the dealership assets for sale so that they could bid at the private sale. The plaintiff did not advertise in any trade publication, but rather, because he had been involved in the business for several years and had personal acquaintance with other Sonitrol distributors, relied upon the plaintiff's own contacts within the industry. A witness for the defendants testified that Sonitrol dealerships were not publicized in trade journals, and Mr. Cook explained that these dealerships were not found in those publications because the assets themselves were salable only to the Sonitrol dealer network. The Chancellor reasoned that advertisement was only to let people know of the sale, and that the most interested people would be the eight other distributors.

The defendants rely on *In re Four Star Music Co., Inc.*, *supra*, and *Investors Acceptance Co. v. James Talcott, Inc.*, 61 Tenn.App. 307, 454 S.W.2d 130 (1969), *cert. denied* (1970). In both cases, the courts found that the notice given was not commercially reasonable. These cases can be

distinguished from the present case. In the *Four Star Music Case,* the court held that sole reliance on network of informal communications within the local music community was not sufficient when the most likely purchasers were on a national or multi-national level. Also, the person handling the sale of the collateral for the secured creditor had no direct experience at all with the music industry. In contrast, the plaintiff in the present case was intimately familiar with the network of Sonitrol distributors and contacting this group concerning the sale of this unique collateral certainly reached the most logical purchasers. In the *Investors Acceptance* case, the secured party presented no evidence as to how many companies were notified or as to what efforts were made at notification except his testimony that the "notice of this sale was generally known in the trade circles." The court stated: "the record in this case is astonishingly devoid of details of the steps, if any, taken by the complainant to conduct in good faith, commercially reasonable sales." 454 S.W.2d at 138. In the present case, evidence was presented as to exactly how many companies were notified and the method of notification. Certainly the evidence was not sketchy or incomplete as in the *Investors Acceptance* case.

The record, therefore, supports the conclusion that Trimble made normal and reasonable contacts consistent with industry practices to dispose of the collateral. Trimble knew that the logical potential buyers were a group of distributors and dealers within the Sonitrol network, and he made reasonable attempts to reach those buyers. We hold that Trimble's efforts to advertise and market the collateral were commercially reasonable.

The last issue in determining whether the sale was commercially reasonable is the sufficiency of the resale price.

The plaintiff sold the dealership to Hart and Moore for $1,150,000. Hart and Moore also agreed to assume the $150,000 debt on the computer. The original transaction between plaintiff and Cook had been for a total of approximately 2 million. The de-

fendants presented some proof that the value of the property was 1.8 or 1.9 million and other proof that its value was 2.5 million, but the trial court rejected this testimony because of the witness' lack of credibility.

■■■ T.C.A. § 47–9–507(2) states, "The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner." A commercially reasonable sale is tested by the procedures employed for the sale rather than the proceeds received; however, the terms of the sale bear scrutiny. *In re Four Star Music Co., Inc., supra.* These procedures, including the purchase price received, were listed by the *Four Star Music Co., Inc.* court:

Although the statute has not attempted to define the parameters of the term "commercially reasonable", case law has specified six factors by which the statute requirements may be measured:

(1) the type of collateral involved; and

(2) the condition of the collateral; and

(3) the number of bids solicited; and

(4) the time and place of sale; and

(5) the purchase price received or the terms of sale; and

(6) any special circumstances involved.

2 B.R. at 461. In this case, given the type of collateral involved (a unique collateral of value only to a certain group of investors), the condition of the collateral (encumbered by present and prospective litigation), the number of bids solicited (only two, but as the court found, this number was low because of defendant's attempts at killing any sales), the time and place of sale (notification of the sale, as discussed earlier, was proper) and the purchase price received (which the trial court found to be the best overall made), we hold that the trial court did not err in finding that the amount received for the collateral was commercially reasonable. This is especially true in light of the last factor to be considered: "any special circumstances involved." The

plaintiff was faced with trying to make a reasonable sale in spite of a recalcitrant debtor's actions to the contrary. The defendants did not put on any credible proof that the dealership was sold for less than the fair market value, and therefore, they can claim no damages. The trial court discounted the testimony that they did present. The plaintiff was not asking for any deficiency. The defendant's rights in the sale were adequately protected. The Chancellor's judgment as to the sale of the dealership is therefore affirmed.

The trial court also took proof on and approved the plaintiff's proposed sale of the distributorship assets in which he held a security interest. T.C.A. § 47-9-507(2) provides in part: "A disposition [of collateral] which has been approved in any judicial proceeding ... shall conclusively be deemed to be commercially reasonable ..." The Chancellor's judgment as to the approval of the sale of the distributorship is also affirmed.

Costs are adjudged against the defendants/appellants.

CRAWFORD, J., and McLEMORE, Special Judge, concur.