Richard M. FLETCHER

v.

Anthony COBUZZI.

Civ. A. No. 79–57 Erie.

United States District Court,
W. D. Pennsylvania.

Oct. 29, 1980.

Ira John Dunn, Erie, Pa., for plaintiff.

Leonard G. Ambrose, Erie, Pa., for defendant.

## OPINION

WEBER, Chief Judge.

This matter comes before the court on cross–motions for summary judgment on the question of liability. The parties have stipulated to uncontested facts as set forth herein.

This suit arises out of a contract for the sale of the Country Villa Restaurant on May 25, 1970, (Exhibit A)[1] between Sellers Cobuzzi and Country Villa, Inc. and Buyer Villa, Inc., a corporation of which plaintiff Fletcher was president. The sale included the land, buildings, good will, inventory, equipment, and the right to use the trade name "Country Villa, Inc." The terms of the original contract included a $180,000 sale price, a $10,000 down payment, $40,000 due in 60 days and the balance of $130,000 financed by a first mortgage on the Coun-

---

1. All references are to stipulated exhibits, and follow plaintiff's letter designation.

try Villa Restaurant at 7% interest, payable in monthly installments of $1,000.

Villa, Inc. was unable to make the $40,000 payment within 60 days and on July 25, 1970, plaintiff Fletcher joined the original parties in a Supplemental Agreement (Exhibit C), both as an officer of Villa, Inc. and also binding himself personally. The supplemental agreement extended the due date and pledged a stock collateral of 19,500 shares of Leggett and Platt (a publicly listed stock on the N.Y.S.E.) as well as a small quantity of other stocks all owned by Fletcher personally. The collateral was put up by plaintiff acting as an individual to secure the debt owed by Villa, Inc. Also under the agreement, Sellers took a second mortgage on the land, premises and fixtures of Country Villa, Inc., and a first mortgage on the land, fixtures, liquor license and all further assets of Villa, Inc. (a separate restaurant) in lieu of the first mortgage on the Country Villa Restaurant provided for in the original agreement. This was necessary because Villa, Inc. needed a clear title to the Country Villa, Inc. restaurant property to secure a first mortgage loan from a bank to finance the down payment on the Country Villa Inc. restaurant property.

Buyer defaulted on the $1,000 monthly installment due Jan. 12, 1971, and the parties (Villa, Inc., Country Villa, Inc., and plaintiff as debtors and guarantors; defendant Cobuzzi as creditor), then entered into a Supplemental Agreement on Feb. 11, 1971 (Exhibit D). This agreement provided for the sale of 1,000 shares of the Leggett & Platt collateral for $14,826 and the deposit of that amount in an escrow account to continue the $1,000/mo. payments to Seller.

On June 2, 1971, the same parties entered into a Supplemental Agreement (Exhibit E), which arranged for the sale of 2,733 shares of the Leggett & Platt collateral. Of the proceeds, $25,261 was used by Buyers for business improvements and $14,576 was applied to the escrow account as prepayment of the debt. The principal balance was thus reduced to $115,692.

The parties entered into a Supplemental Agreement on Feb. 17, 1972, (Exhibit F), after the value of Leggett & Platt stock had risen considerably. In light of that rise the collateral held by Seller–Cobuzzi was reduced from 15,868 shares to 8,900 shares, the balance returned to plaintiff. A further provision of the agreement allowed Cobuzzi to demand of Fletcher sufficient stock to maintain the collateral at 150% of the principal balance. The notice provision of the agreement allowed Cobuzzi to foreclose upon the collateral if, within thirty days of written demand, Fletcher failed to submit sufficient stock to maintain the 150% level. The agreement also required Villa, Inc. to make a yearly payment of $12,000 into escrow each Feb. 12 to further secure the uninterrupted payment of the monthly installments to Cobuzzi. A similar notice provision applied to Villa, Inc.'s failure to make the yearly escrow payment. In return for these measures of greater security, Cobuzzi released the two mortgages provided for in the Supplemental Agreement of July 25, 1970 (Exhibit C), as satisfied without cash consideration.

Nearly a year later, Villa, Inc. failed to make the Feb. 12, 1973 escrow payment of $12,000 and Cobuzzi notified Fletcher of the omission by letter of that date (Exhibit G). In the same letter, Cobuzzi demanded additional stock because the market value of the collateral had dipped below the 150% quota. On March 14, 1973, plaintiff's attorney remitted $12,000 to the escrow account and certificates for an additional 1,000 shares of Leggett & Platt in plaintiff's name but without the necessary stock powers.[2] (Exhibit H). Fletcher was then notified by letter of April 5, 1973, (Exhibit J), that the deficiencies of Feb. 12 would be considered satisfied if the stock powers for the 1,000 added shares were forwarded. Cobuzzi also demanded by that same letter, 1,800 additional shares of Leggett & Platt to remedy an undercollateralization caused by a further drop in stock values. Cobuzzi warned that failure to provide the stock powers and the additional 1,800 shares would be con-

sidered a default under the terms of the Supplemental Agreement of Feb. 17, 1972 (Exhibit F).

■ On March 20, 1973, Villa, Inc., the primary obligor of the debt, filed for bankruptcy under Chapter XI. The Bankruptcy Court entered an order staying any action against Villa, Inc. by its creditors. Seller, Cobuzzi, was notified of the stay by letter of April 4, 1973, (Exhibit I), and was warned by plaintiff's attorney not to take any foreclosure action against the stock collateral. Cobuzzi did threaten foreclosure by letters of April 5, May 3, and May 16, 1973 (Exhibits J, K, L), for failure to supply stock powers and/or maintain the collateral at the appropriate level. While the stay order would prevent any action against the assets of Villa, Inc., it did not preclude a creditor from proceeding against a collateral pledged by an individual guarantor.

On May 23, 1973, after a number of threats to foreclose, Cobuzzi had the collateral of 8,900 originally pledged shares of Leggett & Platt transferred to his name through a Dallas bank. The value of the stock on the following day was $11.50 per share, or $98,122 for the 8,900 shares. If Cobuzzi had made a sale of the stock on that date it would have left a deficit of about $13,000 on the obligation price. Defendant Cobuzzi treated the transfer as a foreclosure and stated in an affidavit dated May 24, 1973, that he considered the debt to be cancelled by the foreclosure, despite the remaining deficit. This affidavit, however, was not communicated to the other parties until plaintiff received a copy after the institution of this suit. Plaintiff denies any knowledge of the claimed foreclosure and defendant does not contradict this with any evidence of notice.

Subsequent to this alleged foreclosure, on September 7, 1973, Fletcher and Cobuzzi agreed to sell 900 shares of the Leggett & Platt collateral, now in the name of Cobuzzi, as a further payment into the escrow account against the balance due. The sale netted $13,747 and left defendant with

2. A form of assignment of share certificates separate from the certificate.

8,000 of the originally pledged shares of Leggett & Platt collateral. Defendant Cobuzzi made no claim to the effects of the supposed foreclosure or to the assertions of the May 24, 1973 affidavit.

During the latter half of 1973, defendant pressed plaintiff for payment of an IRS refund check received by Country Villa, Inc. after the sale of the restaurant in 1970. The refund was on taxes over–paid by Country Villa, Inc. while it was Cobuzzi's corporation, but the check was cashed by plaintiff's corporation Villa, Inc. despite Cobuzzi's protests.

The Bankruptcy Court held the hearing on Villa, Inc. on December 26, 1973. On that date the parties' attorneys reached an agreement for their clients, the terms of which are embodied in a letter from plaintiff's attorney on that date (Exhibit M). Villa, Inc. agreed to withdraw any objection to Cobuzzi's claims before the Bankruptcy Court. The plaintiff Fletcher as guarantor agreed to pay the entire principal and interest due Seller Cobuzzi as well as $1,500 in attorney's fees and the long disputed IRS refund check. In return, Cobuzzi agreed to forego the 150% requirement and allow the stock to rebound on the market. Plaintiff Fletcher was also given the opportunity to redeem the collateral at any time by, at Cobuzzi's option, satisfying the debt with cash or substituting a cash collateral of 110% of principal balance. Also, Villa, Inc.'s attorney forwarded a 15% bankruptcy dividend to Cobuzzi on March 4, 1974 under the debtor's Chapter XI plan, to be applied against the balance of the debt. The monthly installments from the escrow account continued uninterrupted through this entire period.

By letter of Aug. 27, 1974, (Exhibit O), Cobuzzi communicated his intention to sell the remaining 8,000 shares of the original collateral to partially satisfy the debt unless 10,000 additional shares were submitted by plaintiff to better secure the debt. Plaintiff objected to this foreclosure in a letter of Sept. 4, 1974, (Exhibit P), as inappropriate under the original and supplemental agreements, and stated his intention to sub-mit no additional collateral nor immediately satisfy the debt. On that same date, the administrator of the escrow account, and former attorney for both parties, submitted an accounting of the escrow account showing a balance of $8,141, indicating an intention to distribute the funds. Cobuzzi forwarded this accounting to plaintiff's attorney and stated his intention *not* to sell the collateral on Sept. 13, 1974 as threatened earlier.

Each March of the years 1975–79, plaintiff informed defendant's attorneys that he had paid the income taxes on the dividends of the stock held as collateral which were being received by defendant and applied to the balance of the debt.

The last escrow payment received by defendant was on October 20, 1975, when a large balance remained due on the debt. However, no further notice of any default appears on the record.

During these years, Cobuzzi held the 8,000 shares of Leggett & Platt and received all dividends on them. In July and August of 1978, Cobuzzi sold a total of 5,000 shares of this collateral, netting $104,843. Plaintiff had no notice of these sales. In September of 1978 the remaining 3,000 shares split 3 for 2, leaving 4,500 shares in Cobuzzi's hands. In April of 1979, plaintiff attempted to inform defendant by letter that, the stock value being higher than the remaining debt, he would like to sell the collateral and satisfy the debt as provided in the agreement of December 26, 1973 (Exhibit M). Cobuzzi refused to accept the registered letter containing the communication and also refused correspondence from his own attorney concerning the matter.

Receiving no answer to his inquiries, plaintiff filed this suit on April 20, 1979, Plaintiff was still unaware of the stock sale of summer 1978. Plaintiff demanded an accounting from Seller–defendant, and the difference between the estimated remaining debt of $110,000 and the estimated value of the stock collateral of $185,000. Defendant refused registered mail service of the complaint and summons and a default was entered against him on June 11, 1979,

which was later vacated. On June 7, 1979, defendant sold an additional 1,500 shares of the Leggett & Platt collateral for $19,874. Defendant retains at present 3,000 shares of the original collateral as adjusted by the stock split of 1978.

Plaintiff filed an amended complaint on November 2, 1979, claiming the 3,000 remaining shares and an $18,308 surplus on the debt arising from the last sale of collateral and appearing on an accounting provided by Cobuzzi dated June 12, 1979 (Exhibit Y). Plaintiff also requests the difference between the value of the stock when sold by defendant and the value when plaintiff requested sale on April 4, 1979.

Plaintiff's motion for summary judgment seeks a finding of liability only; claiming that defendant did not effectively foreclose in 1973 or in 1978 as alleged by defendant, and that defendant continues to hold the collateral on account for plaintiff. Defendant's cross motion also requests summary judgment on the issue of liability, contending that the foreclosure of May 23, 1973 was valid and that any further communications between the parties did not alter the fact of the prior foreclosure, or in the alternative, that the stock sales of 1978–79 were valid as a foreclosure. Defendant requests that if the alleged foreclosure be found invalid, that summary judgment be entered in his favor for the value of the indebtedness and the costs of collection. Defendant also requests summary judgment for the unpaid balance and interest on the IRS refund check as agreed to in the Dec. 26 agreement.

Both parties in the cross motions and responses thereto, raise no question of a disputed genuine issue as to material facts and have entered into a lengthy stipulation of facts and documents agreed upon. The Court is convinced that the matter is appropriate for disposition on ruling questions of law on the issues of liability.

I.

■ The agreement between the parties establishing a stock collateral, created a security interest. 12A Pa.Stat.Ann. § 9–101,

et seq., (current version at 13 Pa.C.S.A. § 9101 et seq.) "Secured Transactions", is intended to regulate personal property held as security for an obligation. The source of that obligation, whether it be a sale of goods or real estate, is of no importance to the applicability of Art. 9. In the present case, although the obligation arises from the sale of an ongoing business, including real estate, the security for that obligation is composed of stock. Negotiable securities are defined by the Code as "instruments" and so are within the Code meaning of "personal property". 12A Pa.Stat.Ann. § 9–105, comment 3; *Fidelity Bank & Trust Co. of New Jersey v. Production Metals Corp.*, 366 F.Supp. 613 (E.D.Pa.1973). Therefore, the provisions of Art. 9, control a creditor's manner of foreclosure on a security consisting of personal property. 12A Pa.Stat.Ann. § 9–102(1)(a); 68 Am.Jur.2d *Secured Transactions* § 14.

II.

Defendant contends that the transfer of the collateral to his name through a Dallas bank on May 23, 1973 was a valid foreclosure under the statute. We must determine whether such a transfer of stock to the creditor's name is permitted by the Code as a means of foreclosure.

The transfer of stock titles is not technically a sale, but 12A Pa.Stat.Ann. § 9–504, Comment 1, states "Subsection (1) does not restrict disposition to sale: the collateral may be sold, leased, or otherwise disposed of–subject of course to the general requirement of Subsection (2) that all aspects of the disposition be commercially reasonable." Disposition is not defined by the Code, but a mere transfer of names would not appear to be within the meaning of the language of the statute, i. e. "sold, leased, or otherwise disposed of." The connotation carried is of some assignment for value of the creditor's rights to the collateral, and the transfer of title to the creditor would not be such an assignment.

■ Rather, it is more akin to repossession, a perfection of the creditor's rights to

the collateral. Defendant's transfer was merely a means of eliminating plaintiff's legal title to the collateral, and vesting such title in himself. A parallel may be seen in the repossession of tangible property, vesting ownership in the creditor prior to disposition. Thus, such a transfer of title by the creditor to himself will not operate as a foreclosure under the Code.

### III.

In some situations the parties may benefit best without a disposition of the collateral and 12A Pa.Stat.Ann. § 9–505 provides an alternative. The creditor may, upon default, elect to retain the collateral as full satisfaction of the debtor's obligations. This is the import of defendant's uncommunicated affidavit of May 24, 1973, and is his contention in this suit. For an effective strict foreclosure, defendant must demonstrate compliance with the terms of § 9–505.

■ Subsection (2) of § 9–505 requires notice to the debtor of creditor's proposal to retain the collateral as full satisfaction of the debt. The notice must be of strict foreclosure in particular, and not simply of an intent to foreclose. Defendant's letters of Apr. 5, May 3, and May 16, 1973, make no reference to his intention to retain the collateral rather than dispose of it by sale or otherwise, and so they do not fulfill the notice requirements of this section. The May 24, 1973 affidavit states defendant's intentions clearly, but defendant admits it was not sent to any of the interested parties. Defendant has produced nothing indicating notice of strict foreclosure to debtor or guarantor and so defendant's alleged strict foreclosure is invalid for failure to comply with the notice provisions of 12A Pa.Stat.Ann. § 9–505(2). See *In Re Sports Autos, Inc.*, 6 U.C.C.Rep.Serv. 991 (Ref.Dec. W.D.Pa.1969).

■ However, defendant contends that a provision of the parties' Supplemental Agreement of Feb. 17, 1972 constitutes a waiver of notice. Under that provision creditor is required to notify debtor of default and his intent to foreclose. If within 30 days the default has not been cured, creditor may foreclose without any further notice to the debtor. Defendant claims the letters of April 5, 1973, May 3, 1973, and May 16, 1973, satisfy that requirement.

However, 12A Pa.Stat.Ann. § 9–501 provides:

> To the extent that they give rights to the debtor and impose duties on the secured party, the rules stated in the subsections referred to may not be waived or varied ... but the parties may by agreement determine the standards by which the fulfillment of these rights and duties is to be measured if such standards are not manifestly unreasonable."

The above quoted subsection lists 12A Pa. Stat.Ann. § 9–505(2) as one of the sections containing non–waivable rights. Notice of strict foreclosure is one of these rights due a debtor. While the parties may "determine the standards", they cannot eliminate the notice requirement. The notice provision of the Supplemental Agreement does not relieve defendant of his statutory duty under § 9–505(2), because it attempts to eliminate a non–waivable right of a defaulting debtor.

### IV.

Defendant alleges a valid foreclosure under 12A Pa.Stat.Ann. § 9–504 by the stock collateral sales of 1978–79. It must first be determined whether the alleged foreclosure would be invalid for undue delay or improper notice.

■ The code sets no time limit within which disposition must be made. The only requirement is that the time of disposition be "commercially reasonable". 12A Pa. Stat.Ann. § 9–504(2), and Comment 1. The Code recognizes that immediate disposition may not be advantageous to the parties. 12A Pa.Stat.Ann. § 9–504, Comment 6. It is apparent from the value of the stock on the day of the stock transfer, May 23, 1973, that defendant would have suffered a deficit of approximately $13,000. He could have retained a claim against the debtor for such deficiency, but debtor had already

filed for bankruptcy. Under these circumstances the secured party would be justified in postponing disposition until such time as accumulated dividends and increased value would more nearly satisfy the debt. Such a delay could be beneficial to the debtor and its guarantor because a greater return on the collateral would result in a smaller deficiency, or even a surplus. In this light defendant's five–year delay was not unreasonable.

Plaintiff received no notice of the stock sales of 1978–79 and in fact was under the impression that defendant was in possession of the collateral at the time suit was filed. 12A Pa.Stat.Ann. § 9–504(3) requires notice of disposition of collateral after default unless it is "of a type customarily sold on a recognized market." *Alliance Discount Corp. v. Shaw*, 195 Pa.Super. 601, 604, 171 A.2d 548, 550 (1961); *Atlas Credit Corp. v. Dolbow*, 193 Pa.Super. 649, 654, 165 A.2d 704, 708 (1960). The sale of stock in 1978–79 was made on the New York Stock Exchange, a recognized market for the purposes of this provision. *White v. Summers, Uniform Commercial Code*, § 26.10, p. 1111 (2nd Ed. 1980).

## V.

Although the notice and time requirements have been satisfied, the alleged 1978–79 foreclosure by disposition is invalid. Between May, 1973, and the first sale in July, 1978, the parties exchanged numerous communications, took actions inconsistent with an alleged foreclosure, and reached a new agreement which effectively waived the claimed defaults of Spring 1973.

Foreclosure, although threatened by defendant, was not an attractive option for either party. The creditor held a collateral pledged by a guarantor which failed to fully secure the debt, while the party he had recourse to for any deficiency had filed for bankruptcy. Although he could hold the collateral until it increased in value to a point of full satisfaction, it could just as easily decrease in value. Also, the original agreement had established a $1,000/mo. payment schedule to provide seller with a steady income. Defendant had subsequently gone to great lengths to maintain these payments including sale of excess collateral and the establishment of an escrow fund. If forced to hold the collateral in hopes of eventually recovering the full amount of the debt, defendant would find his monthly installments interrupted for an extended period, or he would be forced to sell the stock at an inopportune time. Defendant also would be unable to recover the IRS refund to which he had maintained a long-standing claim against the debtor.

Foreclosure was a disadvantage to the plaintiff because an asset with a good growth potential would be lost. The Leggett & Platt stock had risen from $8/share in 1970 to $24/share in early 1972. Although it had settled near $12–$13/share, repeated growth would recoup plaintiff's losses.

The parties accordingly reached an agreement on December 26, 1973, in which defendant agreed to retain the stock as collateral, allowing it to "reasonably rebound" on the market, as well as forego the 150% requirement. In return, plaintiff agreed to pay the entire principal balance and interest in addition to the IRS refund and attorney's fees. This agreement effectively waived the default which gave rise to the alleged May 23, 1973 foreclosure.

One of the options of a creditor faced with a defaulting debtor is to renegotiate. Defendant could have foreclosed upon the stock collateral in accordance with the provision of 12A Pa.Stat.Ann. § 9–501 et seq., and taken the attendant risks and disadvantages. Instead he chose to negotiate an agreement with plaintiff where he found an opportunity to recover not only the full amount of the debt, but also the disputed IRS check and attorney's fees. Also, defendant allowed plaintiff to continue under the Dec. 26, 1973 agreement for a number of years while receiving the benefits. In the light of the parties' position under the December 26, 1973 agreement, no foreclosure could occur unless a default occurred under the new agreement and none

has been alleged. Therefore, the stock sales of 1978–79 did *not* constitute a valid foreclosure.

### VI.

The Court concludes that the alleged foreclosure of May 23, 1973 is invalid because of Cobuzzi's failure to comply with the provisions of 12A Pa.Stat.Ann. § 9–501 et seq. We also conclude that the alleged foreclosure of 1978–79 was invalid because the Dec. 26, 1973 agreement effectively waived the prior default, and no subsequent default upon which a foreclosure could be made has been alleged.

The Court concludes that plaintiff is entitled to partial summary judgment on the issue of liability and we therefore find defendant liable to plaintiff for the value of all collateral and any proceeds in excess of the balance due him. We also direct defendant to make an accounting to plaintiff concerning the debt, interest and disposition of the collateral. We expressly reserve judgment on issues of damages and the actual value of the excess owed by defendant.

Furthermore, under the express terms of the December 26, 1973 agreement, plaintiff is obligated to defendant on defendant's counterclaim for the unpaid balance and interest on the IRS refund to Country Villa, Inc. and partial summary judgment of liability will be entered on this counterclaim in favor of defendant, the amount of which will be determined by the accounting between the parties.