# IN THE COURT OF APPEALS OF TENNESSEE
## WESTERN SECTION AT JACKSON

COY N. HARAWAY and
REDWING TECHNICAL SYSTEMS,
INC.,

    Plaintiffs/Appellants,

VS.

WILLIAM C. BURNETT,

    Defendant/Appellee.

)
)
)
)
)
)
)
)
)
)
)
)

Shelby Chancery No. 101852-3 R.D.

Appeal No. 02A01-9508-CH-00179

FILED

September 08, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

APPEAL FROM THE CHANCERY COURT OF SHELBY COUNTY
AT MEMPHIS, TENNESSEE
THE HONORABLE D. J. ALISSANDRATOS, CHANCELLOR

**RICHARD L. WINCHESTER**
Memphis, Tennessee
Attorney for Appellants


**FELIX H. BEAN, III**
Memphis, Tennessee
Attorney for Appellee

**AFFIRMED IN PART, REVERSED IN PART
AND REMANDED**

             **ALAN E. HIGHERS, J.**

**CONCUR:**

**DAVID R. FARMER, J.**

**WILLIAM H. INMAN, Sr. J.**

Plaintiffs Coy N. Haraway and Redwing Technical Systems, Inc., appeal the trial court's final judgment which determined that Haraway was required to pay $72,636.30 to redeem collateral in the possession of Defendant William C. Burnett and which dismissed Redwing from this litigation. For the reasons hereinafter stated, we modify in part, affirm in part, and reverse in part the trial court's judgment, and we remand for further proceedings.

## I. FACTUAL BACKGROUND

In December 1989, Haraway and Burnett entered into a purchase/security agreement whereby Haraway agreed to purchase from Burnett 1,000 shares of stock in Redwing Technical Systems, Inc., plus certain patents, for a total purchase price of $35,000. The 1,000 shares of Redwing stock represented 100% of the stock issued by Redwing. Haraway agreed to pay Burnett the $35,000 purchase price according to the following schedule:

> (a) Haraway shall pay Burnett 50% of the first $40,000.00 of net sales collected by Redwing (after dealer discount and sales commissions) until such time as Burnett has been paid the total sum of $20,000.00.

> (b) Thereafter, Haraway shall pay Burnett 25% of the next $60,000.00 of net sales collected by Redwing (after dealer discount and sales commissions) until such time as Burnett shall have been paid the balance of $15,000.00 due him.

> (c) Payment of the above sums shall be made by Haraway to Burnett by the tenth of the month following receipt by Redwing.

> (d) Haraway shall have the option, but not the obligation, to pay Burnett the balance of the $35,000 due him at any time.

In addition to the $35,000 purchase price, Haraway agreed to pay Burnett royalties on Redwing's sales of dust control nozzles in the amount of ten percent (10%) of Redwing's net sales. The agreement provided that Haraway's obligation to pay royalties would cease upon the payment of the entire $35,000 purchase price.

To secure the payment of the $35,000 purchase price, Haraway granted to Burnett a security interest in the stock and patents. In the event of Haraway's default, the

2

agreement afforded Burnett all of the rights and remedies of a secured party under Tennessee's version of the Uniform Commercial Code (UCC). In connection with the purchase/security agreement, Haraway executed an irrevocable stock power which, in the event of Haraway's default under the agreement, assigned all of Haraway's interest in the stock to Burnett and authorized Burnett to sell, assign, or transfer the stock to a third party. After executing the agreement, Haraway became Redwing's president and sole shareholder.

In the years following execution of the purchase/security agreement, Haraway failed to remit timely payments to Burnett as required by the agreement. On July 16, 1992, therefore, Burnett notified Haraway by certified mail that Haraway was in default under the agreement and that, unless Haraway made payment of all amounts due and owing under the agreement, plus interest, within ten days, Burnett would exercise his right pursuant to the UCC to take immediate possession of the collateral.

A dispute arose between Haraway and Burnett as to the correct amount due under the purchase/security agreement. Haraway offered to pay Burnett $48,273 to redeem the collateral, but Burnett refused this amount as being unacceptable. By letter dated August 3, 1992, Burnett informed Haraway that he was repudiating the purchase/security agreement and that he was reasserting his ownership of the collateral, the stock and patents. The stock certificate already was in Burnett's possession. In addition to exercising his ownership rights with regard to the stock, Burnett, through his agent, Douglas Reeves, proceeded to seize control and possession of the patent documents and Redwing's other assets, including its shop equipment and inventory. Burnett then caused the assets to be removed to Montana.

## II. PROCEDURAL HISTORY

On August 24, 1992, Haraway and Redwing filed this action against Burnett seeking injunctive and other relief. Specifically, the complaint sought an injunction (1) restraining Burnett from interfering with Redwing's business operations; (2) ordering Burnett to return

3

Redwing's shop equipment and inventory; (3) and ordering Burnett to return all stock certificates and patent documents. The complaint also sought damages for Burnett's repudiation of the purchase/security agreement and his interference with Redwing's business activities. Asserting that he remained ready, willing, and able to fully perform his obligations pursuant to the agreement, Haraway deposited the sum of $48,273 with the trial court. Haraway obtained these funds from Redwing.

In September 1992, Burnett, a Montana resident, filed a notice of removal in the United States District Court for the Western District of Tennessee. The federal district court remanded the case to the trial court in December 1992 because the amount in controversy was "insufficient to meet the $50,000 jurisdictional minimum for removal of an action based upon diversity of citizenship." The federal court's order of remand was not filed in the trial court until June 1993.

Meanwhile, in December 1992, Burnett filed a bankruptcy petition in Montana. Burnett then filed an adversary proceeding against Haraway in the bankruptcy court based on Haraway's breach of the purchase/security agreement. Haraway responded by filing a motion for mandatory abstention. The United States District Court for the District of Montana granted Haraway's motion and transferred the adversary proceeding to the trial court in April 1993.

After the case was remanded to the trial court, Burnett answered the Plaintiffs' complaint and asserted counterclaims against Haraway for breach of contract, fraudulent misrepresentation, and lack of good faith and fair dealing. Burnett's counter complaint also demanded an audited accounting of Redwing's financial records.

In July 1993, the trial court entered an order which (1) enjoined Burnett from interfering with Redwing's business operations; (2) ordered Burnett to return all inventory, equipment, and other assets or property seized from Redwing; and (3) ordered Burnett to account for an account receivable collected by Burnett on behalf of Redwing.

4

In March 1994, the trial court referred this cause to a special master to determine the following issues: (1) the total amount owed to Burnett under the purchase/security agreement; and (2) the total amount of damages, if any, due Redwing and/or Haraway for business torts allegedly committed by Burnett and/or his agents.

After conducting a hearing on March 24, 1994, the master issued a report determining that Haraway owed Burnett the sum of $34,361 under the purchase/security agreement. This amount included the $35,000 purchase price plus $15,649 in royalties due under the agreement, less a $2,000 payment previously made by Haraway and $14,288 for the Redwing account receivable intercepted by Burnett. Later in his report, the master reduced the total amount owed to $29,861 based on Burnett's failure to return a nozzle worth $4,500 to Redwing. As for the Plaintiffs' claim for damages for Burnett's alleged business torts, the master determined that the Plaintiffs were not entitled to lost profits based on the master's findings that Haraway's prior tender was insufficient to cure the default and that "Burnett acted properly pursuant to [Tennessee Code Annotated sections 47-9-501 and 47-9-503]." In making these findings, the master apparently approved of the procedure whereby Burnett exercised "the Irrevocable Stock Power thus becoming owner of the stock of Redwing, Inc., and as sole shareholder took possession of the assets of the corporation and removed them to Montana." In light of this determination, the master made no finding as to the amount of Redwing's lost profits. At the hearing, however, the Plaintiffs presented a statement of income showing that, in the year preceding Burnett's seizure and possession of Redwing's assets, Redwing averaged a monthly net income of $3,069.67. During the ten months following Burnett's seizure of the assets, Redwing averaged a net loss of $601.60 per month. Thus, the Plaintiffs sought to prove that Redwing lost profits of $36,712.70 for the ten-month period in which Redwing's assets remained in Burnett's possession.

The trial court subsequently entered an order adopting and modifying the master's report. In its order, the trial court found that Haraway materially defaulted under the purchase/security agreement and that Burnett properly exercised the irrevocable stock

power, thereby effectively becoming the owner of Redwing. The trial court modified the master's report by determining that Haraway owed Burnett $48,659 under the purchase/security agreement rather than $29,861 as found by the master. The trial court reasoned that, inasmuch as the parties agreed that the $4,500 nozzle and the $14,288 account receivable were assets of Redwing, these amounts were not properly subject to set-off by Haraway. By "further implication," the trial court then dismissed Redwing as a party plaintiff from this action. The trial court's dismissal of Redwing apparently was based on the court's finding that Burnett, and not Haraway, was the owner of Redwing.

Following motions by the parties, the trial court entered an additional order ruling that the collateral pledged by Haraway was the property of Burnett, but granting Haraway's motion to redeem the collateral. The trial court then referred the case back to the master to determine the following issues: (1) the nature of the collateral pledged to Burnett by Haraway; (2) the expenses reasonably incurred by Burnett in retaking, holding, and preparing the collateral for disposition; and (3) the amount required for Haraway to redeem the collateral. Burnett filed a written objection to Haraway's redemption of the collateral on the ground that the collateral previously had been transferred to Burnett pursuant to the irrevocable stock power.

After conducting a second hearing on January 25, 1995, the master issued a report determining that, per the parties' stipulation, the collateral pledged was 1,000 shares of Redwing stock and six patents. The master determined that Burnett incurred expenses of $11,569.30 in retaking, holding, and preparing the collateral for disposition. This total included the $8,209.50 cost of moving Redwing's assets from Memphis to Montana and back, the $2,950 cost of storing the assets while in Montana, and the $483 cost of certain utilities and rent which Burnett initially was required to pay in order to obtain access to the assets. At the hearing, Burnett also sought reimbursement for $57,734 in travel expenses incurred by Burnett and for $122,608.20 in fees charged by Douglas Reeves. The master found that Burnett had not met his burden of proof in delineating these expenses because Burnett's travel expenses "were not expenses actually incurred but were based on IRS

6

allowances" and because "the contract with Reeves was initially to run the business and included monthly charges for doing so."  As found by the master, the purpose of the contract between Reeves and Burnett was for Reeves to assist Burnett "in the lawsuit and to be in charge of the operation of Redwing's business on an . . . as needed basis to formulate policies and [to administer] said matters in all respects."  Finally, the master determined the cost of redemption to be $53,838.30.  This amount included the $29,861 balance due on the debt as previously found by the master, the $11,569.30 in expenses as found by the master at the second hearing, and an additional $12,408 in unpaid royalties.

Based on the master's second report, the trial court entered a final judgment awarding Burnett the sum of $53,838.30.  The judgment directed Burnett, upon receipt of this sum, to return the Redwing stock certificate to Haraway and to file a UCC-3 release evidencing Burnett's receipt of the payment and his release of any security interest held in the patents.  The judgment additionally directed Haraway to pay $300 to Burnett as civil contempt damages.  As for Burnett's counter complaint, the trial court denied recovery based on the court's finding that Burnett had "failed to demonstrate any actionable damages."

The master later filed an amended report in which he determined the cost of redemption to be $72,636.30.  This amendment was necessary because the master's second report failed to reflect that the trial court previously modified the master's initial report to provide that the balance due on the debt was $48,659 and not $29,861.  The amended redemption amount, therefore, included the $48,659 balance due on the debt, $11,569.30 in expenses, and $12,408 in royalties.  The trial court entered an order modifying its final judgment in accordance with the master's amended report.  As modified, the trial court's final judgment also ordered Haraway to reimburse Burnett $99.75 for one-half the cost of transcribing the master's second hearing.  The trial court subsequently denied the Plaintiffs' motion to alter or amend the final judgment, as well as other motions, and this appeal followed.

7

On appeal, the Plaintiffs raise the following issues for this court's review:

1.      Did the Special Master and the Trial Court err in calculating the amount which Plaintiff Haraway was required to pay Defendant to redeem his collateral?

2.      Did the Special Master and the Trial Court err in failing to apply T.C.A. § 47-9-506 to calculate this sum?

3.      Did the Trial Court err in dismissing Plaintiff, Redwing Technical Systems, Inc. from this litigation?

4.      Did the Special Master and the Trial Court err in failing to award Plaintiff Redwing Technical Systems, Inc. a judgment against Defendant Burnett for the amount of the Redwing receivable intercepted by Burnett ($14,288.00) and the value of the grain nozzle taken and not returned ($4,500.00)?

5.      Did the Special Master and the Trial Court err in determining that Defendant Burnett "acted [properly]" when he confiscated property of Redwing Technical Systems, Inc. which was not part of the collateral pledged to secure Mr. Haraway's debt to Mr. Burnett?

6.      Did the Special Master and the Trial Court err in not awarding Redwing Technical Systems, Inc. its [lost] profits for the period of time that it was out of business as a result of the confiscation of its equipment and inventory?

On cross appeal, Burnett also has raised several issues:

1.      Do the Plaintiff's Complaint, subsequent pleadings and weight of the evidence support the proposition that he is entitled to seek redemption of the collateral?

2.      Were the interpled funds ($48,273.00), which were deposited into the court simultaneously with the filing of this cause, the property of Plaintiff Haraway and, is he properly and lawfully entitled to apply these funds to the amount required to redeem the collateral?

3.      Do the Special Master's calculations take into account all sums to which Defendant Burnett is entitled . . . ?

4.      Has Defendant Burnett been fully and adequately compensated for the egregious conduct of Plaintiff Haraway in connection with the prosecution of this cause?

## III.  HARAWAY'S RIGHT TO REDEEM THE COLLATERAL

As an initial matter, we find it necessary to address Burnett's contention that Haraway was not entitled to redeem the collateral.  Section 9-506 of the UCC governs Haraway's right of redemption:

**47-9-506. Debtor's right to redeem collateral. --** At any time before the secured party has disposed of collateral or entered into a contract for its disposition under § 47-9-504 or before the obligation has been discharged under § 47-9-505(2) the debtor or any other secured party may unless otherwise agreed in writing after default redeem the collateral by tendering fulfillment of all obligations secured by the collateral as well as the expenses reasonably incurred by the secured party in retaking, holding and preparing the collateral for disposition, in arranging for the sale, and to the extent provided in the agreement and not prohibited by law, his reasonable attorneys' fees and legal expenses.

T.C.A. § 47-9-506 (1992). Provided he made a valid tender under this section, therefore, Haraway was entitled to redeem the collateral unless (1) Burnett had disposed of the collateral or entered into a contract for disposition of the collateral under section 9-504, or (2) Burnett had retained the collateral in satisfaction of Haraway's obligation pursuant to section 9-505(2).

On cross appeal, Burnett contends that Haraway was precluded from redeeming the collateral because Haraway's pleadings did not request redemption and because Burnett already had disposed of the collateral before Haraway made a valid tender pursuant to section 9-506. We conclude that both of these contentions are without merit and that the trial court properly allowed Haraway to redeem the collateral.

We first reject Burnett's contention that the trial court improperly granted redemption based on Haraway's failure to request this remedy in his pleadings. The Tennessee Rules of Civil Procedure direct the courts of this state to liberally construe the parties' pleadings so as to do substantial justice. See T.R.C.P. 8.06. Haraway's complaint requested return of the collateral and, in connection therewith, Haraway deposited $48,273 with the trial court, an amount that he contended fulfilled his obligations under the purchase/security agreement. Based on the pleadings, therefore, the trial court acted properly in granting Haraway the remedy of redemption. See Lamons v. Chamberlain, 909 S.W.2d 795, 800 (Tenn. App. 1993) (holding that rescission was not precluded as possible remedy where plaintiff's complaint averred that she had lost her entire investment and prayed for return of down payment).

9

We also reject Burnett's contention that Haraway was precluded from redeeming the collateral on the ground that Burnett already had disposed of the collateral by assigning the stock to himself pursuant to the irrevocable stock power executed by Haraway. Upon the debtor's default, the UCC gives the secured creditor three options:

> First, [the secured creditor] may reduce the claim to judgment, foreclose or otherwise enforce the security interest by judicial procedures pursuant to T.C.A. § 47-9-501(1), (2), (3), (4), (5). Second, [the secured creditor] may repossess and sell the collateral in satisfaction of the obligation. T.C.A. § 47-9-504(3), . . . . Finally, the creditor may propose to retain the collateral in satisfaction of the obligation. T.C.A. § 47-9-505(2).

American City Bank v. Western Auto Supply Co., 631 S.W.2d 410, 419-20 (Tenn. App. 1981) (footnotes omitted).

Regarding the second option, section 9-504 of the UCC provides, in part:

> **47-9-504. Secured party's right to dispose of collateral after default -- Effect of disposition. --** (1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. . . .
>
> . . . .
>
> (3) Disposition of the collateral may be by public or private proceedings and may be made by way of one (1) or more contracts. . . .
>
> (4) When collateral is disposed of by a secured party after default, the disposition transfers to a purchaser for value all of the debtor's rights therein, discharges the security interest under which it is made and any security interest or lien subordinate thereto. . . .

T.C.A. § 47-9-504 (1992).[1]

_____

[1] Regarding the sale or other disposition of the collateral, section 9-504 further provides that:

> Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale. In the case of consumer goods no other notification need be sent. In other cases notification shall be sent to any other secured party from whom the secured party has received . . . written notice of a claim of an interest in the collateral. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is

Authorities generally agree that a secured creditor's transfer of collateral, such as stock, to the creditor's own name does not constitute a disposition under section 9-504 of the UCC. See Fletcher v. Cobuzzi, 499 F. Supp. 694, 698-99 (W.D. Pa. 1980); Sports Courts of Omaha, Ltd. v. Brower, 534 N.W.2d 317, 322 (Neb. 1995); see also IFG Leasing Co. v. Gordon, 776 P.2d 607, 613 (Utah 1989); Ronald A. Anderson, Anderson on the Uniform Commercial Code § 9-504:47, at 425 (3d ed. 1994 & Supp. 1996). Within the context of the UCC, the term "disposition" connotes some transfer for value of the creditor's rights to the collateral and does not contemplate a creditor's transfer of title to himself. Fletcher v. Cobuzzi, 499 F. Supp. at 698; T.C.A. § 47-9-504(4) (1992). In accordance with these authorities, we conclude that Burnett did not effect a disposition of the Redwing stock within the meaning of section 9-504 when he transferred title of the stock to himself and, thus, that Haraway was not precluded from redeeming the stock pursuant to section 9-506.

Burnett cites Comer v. Green Tree Acceptance, Inc., 858 P.2d 560 (Wyo. 1993), for the proposition that, by transferring the collateral into his own name, Burnett disposed of the collateral within the meaning of section 9-506. In Comer, however, the court concluded that the debtor was precluded from redeeming the collateral because the secured creditor had retained the collateral in satisfaction of the debt pursuant to section 9-505(2) of the UCC, not because the creditor had disposed of the collateral within the meaning of section 9-504. Comer v. Green Tree Acceptance, 858 P.2d at 563-64. We conclude that Comer has no application to this case because here Burnett claims to be proceeding pursuant to section 9-504 of the UCC, not section 9-505(2).

We note that, after transferring title to himself, Burnett could have chosen the third available option by electing to retain the collateral in satisfaction of Haraway's obligation pursuant to section 9-505(2). See American City Bank v. Western Auto Supply, 631

---

the subject of widely distributed standard price quotations he may buy at private sale.

T.C.A. § 47-9-504(3) (1992).

11

S.W.2d at 419; T.C.A. § 47-9-505(2) (1992);[2] see also Fletcher v. Cobuzzi, 499 F. Supp. at 699; IFG Leasing Co. v. Gordon, 776 P.2d at 612; In re Szelega, 469 N.Y.S.2d 271, 272-73 (App. Div. 1983). In proceeding pursuant to section 9-505(2), however, a secured creditor must give the debtor written notice of his intent to retain the collateral in satisfaction of the debt and must forfeit his right to a deficiency judgment. See T.C.A. § 47-9-505(2) (1992); see also Comer v. Green Tree Acceptance, 858 P.2d at 565; Anderson on the UCC §§ 9-505:4, 9-505:30, at 656, 671. In the present case, Burnett never has contended that he was proceeding pursuant to section 9-505(2),[3] nor has he provided Haraway with written notice of his intent to retain the collateral in satisfaction of Haraway's obligation under the purchase/security agreement. Accordingly, we need not address the potential application of section 9-505(2) to this case.

## IV. HARAWAY'S COST OF REDEMPTION

Having determined that Haraway was not precluded from redeeming the collateral by virtue of Burnett's disposition of the collateral, we next address the issue of the appropriate redemption amount. The final redemption amount, as calculated by the trial court, was $72,636.30, which included the $48,659 debt as determined by the trial court when it modified and adopted the master's initial report, $11,569.30 in expenses, and $12,408 in additional royalties. We agree with the Plaintiffs' contention that the $11,569.30 in expenses was improperly included in the cost of redemption because these expenses are not authorized by the UCC.

---

[2]That section provides that

> In any other case involving consumer goods or any other collateral a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor if he has not signed after default a statement renouncing or modifying his rights under this subsection. In the case of consumer goods no other notice need be given. In other cases notice shall be sent to any other secured party from whom the secured party has received . . . written notice of a claim of an interest in the collateral. If the secured party receives objection in writing from a person entitled to receive notification within twenty-one (21) days after the notice was sent, the secured party must dispose of the collateral under § 47-9-504. In the absence of such written objection the secured party may retain the collateral in satisfaction of the debtor's obligation.

T.C.A. § 47-9-505(2) (1992).

[3]Neither Burnett's appellate brief nor his counter complaint cite section 9-505(2).

12

In order to redeem the collateral, Haraway was required to pay, in addition to the underlying obligation secured by the collateral, "the expenses reasonably incurred by the secured party [Burnett] in retaking, holding and preparing the collateral for disposition" and in arranging for its sale. T.C.A. § 47-9-506 (1992). The expenses claimed by Burnett and awarded by the trial court, however, were incurred by Burnett when he seized the corporate assets of Redwing, including its equipment and inventory. These corporate assets did not constitute a part of the purchase/security agreement's collateral and, thus, section 9-506 did not authorize Burnett to recover expenses associated with taking or holding this property. In fact, at the January 1995 hearing before the master, Burnett acknowledged that he incurred no expenses in retaking the collateral because the stock certificate already was in his possession prior to Haraway's default and because Burnett had perfected his security interest in the patents by filing a UCC-1 financing statement. Accordingly, we modify the trial court's final judgment to reflect that Haraway's cost of redemption is $61,067 and not $72,636.30.

In making this modification, we reject Burnett's contention on cross appeal that the trial court erred in failing to award him additional expenses for retaking, holding, and preparing the collateral for disposition. Regarding Burnett's claimed travel expenses, the master found that Burnett did not prove his actual expenses but instead based the amount of his claim on the maximum deductions allowed by the IRS. In light of this finding, we affirm the trial court's decision to deny Burnett's claim for $57,734 in travel expenses. We also affirm the trial court's decision to deny Burnett's claim for $122,608.20 in fees allegedly owed to Douglas Reeves. As found by the master, the purpose of the agreement between Burnett and Reeves was for Reeves to assist Burnett in this lawsuit and to be in charge of the operation of Redwing's business on an as-needed basis. The record fails to indicate, however, how Reeves' services related to "retaking, holding and preparing the collateral for disposition." T.C.A. § 47-9-506 (1992). Although Reeves apparently assisted in seizing the corporate assets of Redwing, as we previously have held, these assets did not constitute a part of the purchase/security agreement's collateral. We also note that most of Reeves' invoices cover the period after July 1993, when the trial court entered its

13

order enjoining Burnett from interfering with Redwing's business operations and ordering Burnett to return Redwing's assets.

We likewise reject Burnett's contention that the master's initial report understated the amounts owed to Burnett pursuant to the purchase/security agreement. An appellant waives an issue for purposes of appellate review when he fails to make the appropriate objection at the trial court level. Barnhill v. Barnhill, 826 S.W.2d 443, 458 (Tenn. App. 1991). In this regard, the appellant has the duty "to prepare a record which conveys a fair, accurate and complete account of what transpired in the trial court with respect to the issues which form the basis of the appeal." State v. Boling, 840 S.W.2d 944, 951 (Tenn. Crim. App. 1992); T.R.A.P. 24(b). Absent a transcript of the March 1994 hearing at which the master's alleged error occurred, we are unable to determine whether Burnett raised this issue below. Moreover, we note that the record fails to reflect whether Burnett formally objected to the master's initial report as permitted by the Tennessee Rules of Civil Procedure. See T.R.C.P. 53.04(2).[4] Under these circumstances, Burnett has waived this issue for appellate review.

## _V. BURNETT'S REPOSSESSION OF REDWING'S EQUIPMENT AND INVENTORY

On appeal, the Plaintiffs additionally contend that the trial court erred in determining that Burnett acted properly under the UCC when Burnett confiscated Redwing's equipment and inventory. The Plaintiffs argue that, contrary to the trial court's finding, Burnett was not authorized to repossess Redwing's equipment and inventory because this property was not part of the collateral covered by the purchase/security agreement.

We agree. Under the UCC, upon the debtor's default, the secured creditor's right to take possession of the debtor's property extends only to the collateral. T.C.A.

---

[4]As pertinent, rule 53.04(2) provides that:

> Within ten (10) days after being served with notice of the filing of the [master's] report, any party may serve written objections thereto upon the other parties. Application to the court for action upon the report and upon objections thereto shall be by motion and upon notice as prescribed in Rule 6.04.

T.R.C.P. 53.04(2).

§ 47-9-503 (1992). A secured creditor wrongfully repossesses property when the creditor takes possession of property that is not subject to the security interest. Anderson on the UCC § 9-503:64, at 327. In addition to asserting his rights to the collateral in this case, the stock and patents, Burnett proceeded to repossess Redwing's equipment and inventory. Burnett was not authorized to repossess this property because Redwing's equipment and inventory was not the subject of Burnett's security interest. We conclude, therefore, that the trial court erred in ruling that Burnett acted properly in repossessing Redwing's property.

At the second hearing before the master, Burnett asserted that he was authorized to repossess Redwing's equipment and inventory pursuant to section 9-501 of the UCC. As pertinent, that section provides that:

> When a debtor is in default under a security agreement, a secured party has the rights and remedies provided in this part and except as limited by subsection (3) those provided in the security agreement. He may reduce his claim to judgment, foreclose or otherwise enforce the security interest by any available judicial procedure. If the collateral is documents the secured party may proceed either as to the documents or as to the goods covered thereby. . . .

T.C.A. § 47-9-501(1) (1992). Thus, this section authorizes the secured party, in the event the collateral is a document, to proceed either as to the document or as to the goods covered thereby. In citing this UCC section at the hearing below, Burnett apparently was taking the position that the Redwing stock certificate was a document and that Redwing's equipment and inventory were the goods covered by such document.

This argument is without merit. Under Article 9 (Chapter 9) of the UCC, the term "document" refers to a document of title as defined in the UCC's section of general definitions. T.C.A. § 47-9-105 (1992). The UCC generally defines a document of title to include a

> bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, and also any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers. To be a document of title a document must purport to be issued by or addressed to a bailee and purport to

15

> cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass.

T.C.A. § 47-1-201(15) (1992). The stock certificate held by Burnett as collateral in this case does not fall within the foregoing definition. A stock certificate is not a document which in the regular course of business evidences the possessor's entitlement to identifiable goods; rather, a stock certificate is an instrument which represents a share, participation, or other interest in the issuer's property or enterprise. See T.C.A. §§ 47-8-102(1), 47-9-105(1)(i) (1992); see also FDIC v. Caliendo, 802 F. Supp. 575, 578 (D.N.H. 1992). See generally Anderson on the UCC §§ 1-201:231 to :244, at 633-37 (discussing what is and is not a document of title); see also Hinton v. Carney, 250 S.W.2d 364, 365 (Tenn. 1952) (noting that ownership of all capital stock of corporation does not make shareholder owner of corporation's property); accord Vella v. National Pizza Co., No. 02A01-9311-CV-00254, 1994 WL 618606, at *3 (Tenn. App. Nov. 9, 1994).

On cross appeal, Burnett also asserts that he was entitled to repossess Redwing's equipment and inventory because he became the owner of Redwing pursuant to the irrevocable stock power executed by Haraway in connection with the purchase/security agreement. In executing the stock power, Haraway agreed that, in the event of his default under the purchase/security agreement, all of his interest in the stock would be transferred to Burnett.

Again, we find Burnett's argument to be without merit. In matters concerning the parties' rights, obligations, and remedies, the provisions of Article 9 apply whether title to the collateral is in the secured creditor or in the debtor. T.C.A. § 47-9-202 (1992). Thus, even if title to the Redwing stock was transferred to Burnett's name after default, this transfer did not affect the parties' rights, obligations, and remedies under Article 9. Further, to the extent that the provisions of Article 9 grant certain rights to the debtor and impose certain duties on the secured creditor in the event of default, these provisions may not be waived or varied by the parties. T.C.A. § 47-9-501(3) (1992). These provisions include the UCC sections dealing with the secured creditor's disposition of the collateral (T.C.A. §§ 47-9-504(3), 47-9-505(1)), the secured creditor's retention of the collateral in

satisfaction of the debtor's obligation (T.C.A. § 47-9-505(2)), the debtor's redemption of the collateral (T.C.A. § 47-9-506), and the secured creditor's liability for failure to comply with Article 9's default provisions (T.C.A. § 47-9-507(1)).

In applying these principles, this court previously has held that a stock pledge agreement which purports to vest the stock in the secured creditor upon the debtor's default is invalid; such an agreement neither waives the debtor's rights under Article 9 nor terminates the debtor's rights of ownership in the stock. Trimble v. Sonitrol of Memphis, Inc., 723 S.W.2d 633, 638-39 (Tenn. App. 1986); accord Data Sec., Inc. v. Plessman, 510 N.W.2d 361, 365-66 (Neb. Ct. App. 1993); 18 C.J.S. Corporations § 264 (1990). In Trimble, the language of the stock pledge agreement clearly provided that, upon default, the stock would vest in the secured creditor. Trimble v. Sonitrol, 723 S.W.2d at 638. The pledge specifically included all "voting and other shareholder rights." Id.

In commenting on the effect of such an agreement, one authority explained:

> The mere fact that the debtor defaults does not terminate the debtor's ownership in the collateral. The concept of strict foreclosure that was followed by the law centuries ago does not apply, with the consequence that default does not in itself extinguish the debtor's rights but merely satisfies a condition precedent to the creditor's right to invoke certain remedies, one of which is a right to sell the collateral which will effect the termination of the debtor's ownership. Thus, on the default of the debtor the creditor has the right to repossess and dispose of the collateral but does not acquire title automatically.
>
> A provision in an agreement covering the pledge of stock that upon default "voting and other shareholder's rights" were to vest in the pledgee is invalid and does not deprive the pledgor of standing to attack the commercial reasonableness of the disposition of the collateral.

Anderson on the UCC § 9-501:42, at 234 (citing Trimble v. Sonitrol of Memphis, Inc., 723 S.W.2d 633 (Tenn. App. 1986)) (footnotes omitted); see also T.C.A. § 48-16-203(d) (1988) (providing that, for purposes of assigning liability, pledgor, and not pledgee, remains holder of shares in corporation pledged as collateral security).

Another authority has succinctly described the effect of the UCC's default provisions on title to the collateral:

> The default provisions in the UCC do not automatically transfer title to the secured party upon default. . . . The provisions found in the UCC grant broad rights to the secured party to repossess the security in order to sell or otherwise dispose of that property upon default. When the creditor repossesses the secured property, however, it obtains only the right of possession, not title. . . . Under the UCC, default does not divest a debtor of all right and interest in the secured property, nor is the secured party, the creditor, vested with the unlimited power to deal with the property as it wishes.

Comer v. Green Tree Acceptance, Inc., 858 P.2d 560, 563 (Wyo. 1993) (citations omitted).

In accordance with the foregoing authorities, we hold that the irrevocable stock power executed by Haraway in this case was ineffective to automatically transfer title of the Redwing stock to Burnett in the event of default and, thus, did not vest Burnett with unlimited power to deal with Redwing's property as he wished. The stock power neither waived Haraway's rights under Article 9 nor divested him of ownership rights in the stock. Accordingly, contrary to Burnett's argument on cross appeal, the stock power did not authorize Burnett to assume control of Redwing and to repossess its equipment and inventory.

A creditor who wrongfully takes possession of property may be held liable for conversion damages and for general damages, such as lost profits. See Davenport v. Chrysler Credit Corp., 818 S.W.2d 23, 30-32 (Tenn. App. 1991); Walker v. Associates Commercial Corp., 673 S.W.2d 517, 521 (Tenn. App. 1983); Harris Truck & Trailer Sales v. Foote, 436 S.W.2d 460, 464 (Tenn. App. 1968); Anderson on the UCC §§ 9-503:64, 9-503:74, at 327, 339; see also Lance Prods., Inc. v. Commerce Union Bank, 764 S.W.2d 207, 213 (Tenn. App. 1988). At the initial hearing before the master in this case, the Plaintiffs sought to prove that Redwing lost profits as a result of Burnett's wrongful repossession of Redwing's assets. The master denied the Plaintiffs' claim for lost profits based, not on evidentiary grounds, but on the master's finding that Burnett acted properly under the UCC, and the trial court adopted this portion of the master's report. Inasmuch as neither the master nor the trial court made any findings with regard to the evidence of

lost profits presented by the Plaintiffs, we remand for the trial court to reconsider Redwing's claim for lost profits.[5]

## VI. THE TRIAL COURT'S DISMISSAL OF REDWING

Having determined that Redwing may be entitled to lost profits for Burnett's conversion of its equipment and inventory, we next address the issue of the trial court's dismissal of Redwing from this lawsuit. In this regard, inasmuch as we have held that Burnett did not become the owner of Redwing pursuant to the irrevocable stock power, we also must reverse the trial court's order dismissing Redwing. The trial court apparently dismissed Redwing based on the court's conclusion that Burnett was the owner of Redwing and, thus, that Haraway had no authority to maintain this action on behalf of Redwing. Because Haraway's ownership interest in Redwing was not terminated by Burnett's actions taken pursuant to the irrevocable stock power, we hold that Haraway was not precluded from maintaining this action on behalf of Redwing on this basis. Other than his alleged ownership of Redwing pursuant to the irrevocable stock power, Burnett has advanced no other basis to challenge Haraway's authority, as Redwing's president and sole shareholder, to bring this lawsuit on behalf of Redwing. See Lewis ex rel. Citizens Sav. Bank & Trust Co. v. Boyd, 838 S.W.2d 215, 220 (Tenn. App. 1992) (noting that responsibility for determining whether corporation should pursue judicial remedies for its injuries falls on its officers and directors).[6]

In his initial report, the master found that Burnett owed Redwing $14,288 for an account receivable that he intercepted and $4,500 for a nozzle that he failed to return. In accordance with these findings, we conclude that a judgment in the amount of $18,788 should be entered in favor of Redwing.

---

[5]As presented, the Plaintiffs' claim for lost profits belongs to Redwing, not Haraway. See Hadden v. City of Gatlinburg, 746 S.W.2d 687, 689 (Tenn. 1988) (holding that sole shareholder of corporation may not bring suit individually to right wrong done to corporation; action must be brought by corporation).

[6]In any event, we note that Redwing may have been a necessary party to this action. See Citizens Real Estate & Loan Co. v. Mountain States Dev. Corp., 633 S.W.2d 763, 766 (Tenn. App. 1981) (concluding that all parties claiming title to subject property were necessary parties to lawsuit); T.R.C.P. 19.01; see also Japan Petroleum Co. v. Ashland Oil, Inc., 456 F. Supp. 831, 836 n.8 (D.C. Del. 1978) (noting that corporation generally is indispensable party in any action affecting its rights and liabilities).

## VII.  REMAINING ISSUES ON APPEAL

In light of the foregoing analyses, we also hold that the trial court properly permitted Haraway to redeem the collateral using $48,273 in funds obtained from Redwing.  As we have held, Haraway's ownership interest in Redwing was not extinguished by Burnett's exercise of the irrevocable stock power.  Moreover, we note that the purchase/security agreement itself contemplated that Haraway would use Redwing's revenues to pay the purchase price for Redwing.

Finally, we reject Burnett's argument on cross appeal that he is entitled to additional damages for Haraway's "egregious conduct."  The trial court found that Burnett had "failed to demonstrate any actionable damages" on his counterclaims, and we conclude that the evidence does not preponderate against this finding.

## VIII.  CONCLUSION

The trial court's judgment is hereby modified to reflect that Haraway's cost of redemption is $61,067 instead of $72,636.30.  We reverse that portion of the trial court's judgment dismissing Redwing from this lawsuit and enter a judgment in favor of Redwing in the amount of $18,788.  We also reverse that portion of the trial court's judgment denying Redwing's claim for damages resulting from Burnett's conversion of Redwing's equipment and inventory.  In connection therewith, this cause is remanded for the trial court to reconsider Redwing's claim for lost profits, and for any further proceedings consistent with this opinion.  In all other respects, the trial court's judgment is affirmed. Costs on appeal are taxed to Burnett, for which execution may issue if necessary.

_____
HIGHERS, J.


CONCUR:


_____
FARMER, J.

20

INMAN, Sr. J.